IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 09-10005-01-MLB |
| | ) | |
| LAZARE KOBAGAYA, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**

The Government respectfully submits this memorandum of law in opposition to the motion of defendant Lazare Kobagaya to suppress the evidence obtained as a result of a search warrant executed at Kobagaya's home. For the reasons set forth below, the Government requests that the Court deny defendant's motion in its entirety.

**BACKGROUND**

On January 13, 2009, a grand jury sitting in this district indicted defendant Lazare Kobagaya on two counts. Count One charges Defendant with Unlawful Procurement of Naturalization, in violation of Title 18, United States Code, Section 1425(a). Count Two charges Defendant with Fraud and Misuse of an Alien Registration Card, in violation of Title 18, United States Code, Section 1546(a).

**A.     The Investigation**

The United States Bureau of Immigration and Customs Enforcement (ICE) and the Office of Special Investigations at the United States Department of Justice (OSI) have been conducting long-term investigations into individuals who have committed significant human rights offenses outside the United States, and then concealed those criminal acts from American immigration officials for the purpose of illegally obtaining visa documents, legal residency and ultimately full citizenship in the United States.  As part of this investigation, ICE and OSI developed evidence that defendant Kobagaya directly participated in the Rwandan genocide of 1994.  Review by ICE and OSI of Defendant's immigration documents and other materials submitted by defendant Kobagaya upon his naturalization in the United States established that he lied in his official immigration forms and concealed his culpability and crimes during the Rwandan genocide.

**B.     The Search Warrant of Kobagaya's House**

**1.     The Application for the Search Warrant**

On April 22, 2009, Senior Special Agent Mark Larkin of ICE went before Magistrate Judge Donald W. Bostwick and submitted an application for a search warrant at 3232 SW Oakley Avenue, Topeka, Kansas, Kobagaya's residence.  The search warrant was based upon information obtained through interviews of eighteen (18) witnesses in Rwanda, as well as historians, and other law enforcement officers, among other sources of information, and sought the following: Kobagaya's fraudulently-obtained passport and other fraudulently-obtained immigration documents that allowed defendant to enter and remain in the United States; evidence of government benefits Kobagaya obtained with said fraudulently-obtained documents; documents and physical items linking defendant to the 1994 Rwandan genocide or showing his

presence in Rwanda at that time; photographs reflecting defendant's whereabouts and activities during the 1994 Rwandan genocide; and documents that revealed the identity of his relatives and others who helped his escape from Rwanda immediately after the genocide.  Magistrate Judge Bostwick signed the search warrant on April 22, 2009.  The search warrant affidavit provided detailed facts about Agent Larkin's investigation, including the agent's thirteen years of experience investigating immigration fraud crimes, the details of the investigation into Kobagaya's fraudulent immigration and visa documents, as well as his activities during the genocide in Rwanda in 1994, as support for the conclusion that probable cause existed to believe that evidence of immigration fraud crimes would be found in Kobagaya's residence.

> **2.      Execution of the Search Warrant**

On April 23, 2009, Agent Larkin and other ICE agents executed the April 22, 2009 search warrant.  During the search of the residence, the agents discovered Kobagaya's passport and immigration paperwork, including Kobagaya's Form I-551.  Agents also recovered photographs of Kobagaya that the agents believed were taken in Rwanda during the 1994 genocide.  Finally, pursuant to the warrant, the agents seized letters, written in the Rwandan native language (Kinyarwanda) or in the related language of neighboring Burundi (Kirundi), that they believed discussed events that occurred during the 1994 Rwandan genocide or defendant's immigration crimes.

3

**ARGUMENT**

Defendant Lazare Kobagaya seeks to suppress evidence obtained as a result of the execution of the search warrant.  Defendant claims that the search warrant was overbroad and lacking in the requisite particularity.  Moreover, Kobagaya asserts that the agents executing the warrant failed to comply with the requirements of Rule 41 of the Federal Rules of Criminal Procedure and Title 18, U.S.C., § 3104.  In the first instance, the search warrant described the items to be searched with sufficient particularity in that it enabled the agents to reasonably ascertain and identify the things authorized to be seized.  Further, the agents executing the warrant complied with the requirements of Rule 41 and Section 3105.  For the reasons stated below, this motion should be denied.

**I.     The Warrant Identified the Items to Be Searched With Sufficient Particularity**

      **A.     The Applicable Law**

The Fourth Amendment requires warrants "particularly describe the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV.  A sufficiently particular warrant "allows the searcher to reasonably ascertain and identify the things authorized to be seized," leaving "nothing to the officer's discretion as to what is to be seized, so that the officer is prevented from generally rummaging through a person's belongings." United States v. Guidry, 199 F.3d 1150 (10th Cir. 1999) (quoting United States v. Hargus, 128 F.3d 1358, 1362 (10th Cir. 1997)).  A warrant describing "items to be seized in broad and generic terms may be valid 'when the description is as specific as the circumstances and the nature of the activity under investigation permit.'" United States v. Leary, 846 F.2d 592, 600 (10th Cir.1988) (quoting United States v. Santarelli, 778 F.2d 609, 614 (11th Cir.1985)); see also Hargus, 128 F.3d at

4

1363.  The number of files that could be scrutinized is not determinative. The search and seizure of large quantities of material is justified if the material is within the scope of the probable cause underlying the warrant. United States v. SDI Future Health, Inc., 568 F.3d 685 (9th Cir. 2009).

"Even if the warrant was not specific enough, [a] court should not suppress the evidence [if] the agents seized it in objectively reasonable reliance on the warrant." Guidry, 199 F.3d at 1153 (quoting (United States v. Robertson, 21 F.3d 1030, 1034 (10th Cir.1994)). "[O]ur good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization. In making this determination, all of the circumstances . . .  may be considered." United States v. Leon, 468 U.S. 897, 922 n. 23 (1984).

Moreover, the Tenth Circuit has held that "the knowledge of the executing officer can be considered in determining the sufficiency of the description [of a place to be searched]." United States v. Occhipinti, 998 F.2d 791, 799 (10th Cir. 1993).  The Tenth Circuit has also applied the good-faith exception when the officer who swore out the affidavit helped execute the warrant. See United States v. Simpson, 152 F.3d 1241, 1248 (10th Cir. 1998).

**B.     There Was Probable Cause to Search for and Seize The Items Listed In the Eight Paragraphs of the Search Warrant**

As a threshold matter, Magistrate Judge Bostwick found that there was probable cause to believe that Kobagaya possessed his fraudulently-obtained passport and other immigration documents and fruits of those crimes; documents, photographs and other indicia of his presence in Rwanda and participation in the 1994 Rwandan genocide; and identifying documents of relatives and others who assisted his escape from Rwanda; and defendant does not directly contend otherwise in his instant motion.  However, as is discussed in greater detail below, infra,

5

in insisting that the search warrant lacked sufficient particularity, Defendant repeatedly implies that there was no probable cause to search for items, alleging that paragraphs of the search warrant would not refute the allegations in the indictment or "have nothing to do with the crimes" (Def. Mtn. at 8).

Of course, the Tenth Circuit has exhorted courts to give a magistrate judge's findings of probable cause <u>substantial</u> deference, and doubts should be resolved in favor of upholding the warrant. <u>See</u>, <u>e.g.</u>, <u>United States v. Nolan</u>, 199 F.3d 1180, 1181 (10th Cir.1999). And the magistrate judge's conclusions that there was probable cause to believe that Kobagaya possessed these items in his residence were fully supported by the evidence included in the search warrant affidavit setting forth Kobagaya's activities during the 1994 Rwandan genocide through his fraudulently obtaining American citizenship. Specifically, the information in the affidavit included the following:

- On or about April 15, 1994, Kobagaya addressed the Hutus of his commune, made derogatory remarks about Tutsi, and then directed the Hutu to burn the houses of local Tutsi. Following this, the Hutu broke into at least two groups. Kobagaya was in charge of one of the groups, which consisted of approximately seventy Hutu men. This group proceeded to burn down houses belonging to Tutsi. Any member of this group who tried to stay back or not participate in the burning was beaten.

- On or about April 16, 1994, Kobagaya ordered another individual to participate in killing Tutsi. When the individual refused, Kobagaya threatened to kill him if he did not do as he was told and Kobagaya stabbed the man in the leg with a weapon. As a result, the man complied with Kobagaya's orders and eventually murdered a Tutsi.

- Between April 16 and April 19, 1994, witnesses interviewed by Agent Larkin saw Kobagaya leading and participating in multiple attacks against hundreds of Tutsi who had fled to Mount Nyakizu, Rwanda, to escape the killing. Kobagaya mobilized attackers and ordered and coerced them to continue their participation in the killing of Tutsi.

- During late June to early July of 1994, Kobagaya fled Rwanda with relatives and other individuals. He fled to the Congo, then Kenya where he resided in a refugee camp until immigrating to the United States.

- On March 6, 1997, Kobagaya submitted an Immigrant Visa Application, Optional Form 230, to the Wichita office of the United States Citizenship and Immigration Services in Wichita, Kansas.

- In Kobagaya's Optional Form 230 application for immigrant visa and alien registration at Part I, question 21, he stated that he had lived in Burundi from 1993 to 1995. The evidence set forth above shows this statement to be false.

- In Kobagaya's Optional Form 230 application for immigrant visa and alien registration at Part Two, question 33c, he stated that he had not engaged in genocide. The evidence set forth above shows this statement to be false.

- By means of the above-described statements, Kobagaya obtained his Alien Registration Receipt Card and used that card when applying for naturalization. My investigation shows that Kobagaya obtained his Alien Registration Receipt Card by fraud as evidenced by the facts presented above.

- Moreover, on April 11, 1996, during his naturalization interview at the Wichita office of the United States Citizenship and Immigration Services in Wichita, Kansas, Kobagaya used and possessed the alien registration card described earlier and presented it as evidence of his authorized stay in the United States.

- On Kobagaya's Form N-400 Application for Naturalization, Part 10 Question D.15 and in his subsequent interview under oath, Kobagaya stated that he had not committed a crime for which he had not been arrested. However, Kobagaya, pursuant to Rwandan law, could be arrested for his involvement in urging Hutu to commit arson and murder, as well as his stabbing attack on the witness described above. Thus, Kobagaya's sworn statement on April 11, 1996 to immigration officials was false.

- In Kobagaya's Form N-400 Application, Part 10 Question D. 23, and in his subsequent interview under oath, Kobagaya stated that he had never given false or misleading information to any U.S. government official while applying for any immigration benefit or to prevent deportation, exclusion or removal, and at Part 10 Question D. 24., and in his subsequent interview under oath, Kobagaya stated that he had never lied to any U.S. government official to gain entry or admission into the United States. That statement was false.

- Kobagaya's Alien Registration Receipt Card, United States Passport, Refugee Reentry Permit and Certificate of Citizenship and related documents are still in his possession, as none of these items have been turned over to the United States. Accordingly, there is probable cause to believe they are at his current residence.

- Kobagaya used these documents to obtain benefits from the United States government

including but not limited to Social Security, Medicare, Medicaid.  Agent Larkin determined that these agencies were corresponding with Kobagaya and that Kobagaya received mail from these agencies at his residence.

- Further, Agent Larkin, through his training and experience, knew that an individual who gains entry into the United States will ordinarily retain evidence of residence in his former country.  Some of these documents routinely include passports, birth certificates, voter registration cards, political party affiliation, military identification, photographs, letters, personal effects, identity documentation and documentation of alien status in the United States.

- An individual who gains entry into the United States will not ordinarily maintain these former documents, information and materials on his person.

- An individual who gains entry into the United States typically maintains these former documents, information and materials in his residence, place of work, or other locations wherein he exercises private control, such as a storage facility or safe deposit box.

- An individual who gains entry into the United States will ordinarily bring with them and retain certain items, materials and memorabilia from their home country which reflect the time they lived there. These items include but are not limited to photographs, newspaper clippings, souvenirs, mementos, personal effects and documents showing affiliation with political groups or the military.

There is no more powerful evidence that a defendant has participated in murder, arson and other crimes than the statements of eighteen witnesses corroborated by records that reflect that the witnesses observed the defendant exhort others to commit, and joined others in participating, murder, arson and other crimes.  And Agent Larkin's affidavit made clear that he had reviewed Kobagaya's subsequent U.S. immigration forms and confirmed that Kobagaya lied in these forms when he denied his presence in Rwanda during the genocide, as well as his participation in crimes such as murder and arson and genocide.   Finally, Agent Larkin, a senior special agent with vast experience investigating immigration fraud cases, noted that individuals, such as Defendant, who gain entry into the United States often retain -  in their homes or outside storage facilities -  key evidence about their whereabouts prior to U.S. entry, as well as

8

documents memorializing their political affiliation, membership in social and other types of organizations, and their immigration documents.  In Kobagaya's case, such documents would be key evidence concerning his presence in Rwanda during the genocide, his membership in organizations that perpetrated the genocide, and his use of his fraudulently obtained documents for immigration, travel, and obtaining U.S. government benefits. The affidavit thus clearly contained sufficient proof of Kobagaya's possession in his residence of the items authorized to be searched, which supported Magistrate Judge Bostwick's determination, and his finding of probable cause should not be disturbed.

Accordingly, there was sufficient evidence for Magistrate Judge Bostwick to conclude that there was probable cause that Kobagaya had in his residence fraudulently-obtained immigration documents; evidence that defendant obtained government benefits with those fraudulently-obtained immigration documents; photographs, identity cards, and other listed items that established that defendant in fact was present in Rwanda and participated in the genocide in 1994; and documents identifying those who assisted his escape from Rwanda and participated in that genocide.  And it was therefore not surprising that after helping draft and swear out the search warrant affidavit, Agent Larkin found those very items in Defendant's home when he executed the warrant the next day.  Given the evidence set forth above, Kobagaya should not be heard that there was no probable cause, or any basis whatsoever, to search for certain categories of evidence.

### C.  Each Paragraph of The Warrant Identified the Items to Be Searched With Sufficient Particularity

Defendant's primary complaint in his motion to suppress appears to be that the wording

of each and every paragraph of the search warrant  was defective because it "failed to state with particularity the items to be search for." (Def. Mtn. at 3-4).  However, to make this claim, Kobagaya goes to great lengths to strain the plain language of the warrant in an attempt to muddy what was actually quite clear.  Indeed, a simple reading of the search warrant, specifically Attachment B which sets forth the items to be searched, makes readily apparent that the search warrant fully described the items to be searched with the requisite particularity as set forth by the Tenth Circuit.  For ease of reference, the Government sets forth below each of the paragraphs of Attachment B of the search warrant, and discusses how each satisfies the Tenth Circuit's particularity requirements:

1.    **Documents in the name of or bearing the name of KOBAGAYA/KABAYA/LAZARE/LAZARO, related to and including, but not limited to: the fraudulently obtained alien registration receipt card, United States Passports, other passports, Certificate of the United States Citizenship, identity documentation and documentation of alien status in the United States which authorized KOBAGAYA's entrance into and continued presence in the United States.**

This paragraph authorized Agent Larkin to search for the fruits of crimes charged in the indictment, that is, fraudulently obtained citizenship and the relevant immigration documents he used to obtain citizenship.  This paragraph clearly sets out what is to be searched for with specificity and particularity - fraudulently obtained immigration documents in the name of defendant, and attendant documents.  The paragraph lists the specific types of documents at issue, such as the alien registration receipt card, United States passport, Certificate of United States Citizenship, among others listed above.

Given that, Defendant's complaints about this first paragraph of the search warrant are difficult to fathom.  He states that the paragraph either "permits the seizure of any document

bearing the name Kobagaya" or permits "seizure of any document bearing Kobagaya's name that somehow relates to the listed documents, even if the seized document contained no indication that the listed documents were obtained by fraud." (Def. Mtn. at 5-6).   However, the plain wording of the paragraph, read as whole, is focused on those documents that are, or are related to, the documents that Kobagaya fraudulently obtained.   Clearly, if the document is not itself one of the documents that the affidavit alleges was fraudulently obtained, this paragraph only authorizes seizure if it relates to – that is, was used to help procure or was procured with the use of – the fraudulently obtained document.   Put simply, this paragraph authorized Agent Larkin to search for the clearest evidence of his unlawful conduct – fraudulent immigration documents. Because Magistrate Judge Bostwick had concluded that there was probable cause to search for the evidence of these crimes, this paragraph is entirely proper. See Simpson, 152 F.3d at 1246.

Finally, defendant takes issue with this paragraph's – and every other paragraph's – use of the phrase "but not limited to." (Def. Mtn. at 5).   However, the use of that phrase has not been deemed to be problematic in a host of cases.   See, e.g., Cassady v. Goering, 567 F.3d 628 (10th Cir. 2009); United States v. Pringle, No. 01-2341, 2002 WL 31868177 (10th Cir. 2002) (Tenth Circuit has upheld nearly identical warrant, which also included a "but not limited to"clause).   Of course, if inartfully drafted, the phrase "but not limited to" can be problematic. See United States v. Kaufman, No. Crim. 04-401441-01, 2005 WL 2304345 (D. Kansas 2005) (Belot, J.) (citing United States v. LeBron, 729 F.2d 533 (8th Cir. 1984)).   In the instant paragraph, and in paragraph 3, it would have been better if the phrase were not used, and the Government respectfully requests that it be severed.   See LeBron, 729 F.2d at 533.

Moreover, as discussed more fully below, Agent Larkin, who helped draft the affidavit,

swore to the truth of the affidavit, executed the warrant, and was the lead agent in the entire investigation, acted in good faith in executing the warrant and did not search for items beyond what this paragraph, without the offending phrase, authorized.  Accordingly, the Government respectfully requests that the Court adopt the same remedy as in Kaufman and strike the phrase from this paragraph in the search warrant.  Id.  With that remedy in place, defendant's motion as to this paragraph is therefore without merit.

2.   **Documents related to KOBAGAYA's activities and whereabouts during the time of the Rwandan Genocide in 1994 including, but not limited to, birth certificates, voter identification cards, military identification cards, driver's licenses or other evidence of foreign nationality or citizenship.**

Similarly, this paragraph is quite clear in what it authorizes Agent Larkin and his fellow agents to search – documents relating to his whereabout during the Rwandan Genocide of 1994, and his activities in that genocide, including voter registration cards and military identification cards.  The affidavit made clear why there was probable cause to search for these items, as defendant had lied in his immigration forms by claiming that he was in Burundi during the Rwandan genocide, rather than an active participant in the genocide on the ground in Rwanda.

In an effort to make unclear what is particular and specific, Defendant does no more than baldly assert that this paragraph is a "general warrant" because it permits the seizure of "anything related to Kobagaya's activities and whereabouts in 1994." (Def. Mtn. at 6).  That claim is without merit; the paragraph limits a search to specific types of documents related to Kobagaya's activities and whereabouts during the Rwandan genocide in 1994.   By its terms, the paragraph only authorizes the seizure of documents – not anything – and the documents must relate to Defendant's activities and whereabouts vis a vis the 1994 Rwandan genocide. The paragraph even lists specific examples of the types of documents at issue.  Given the

circumstances and nature of Kobagaya's activities in 1994 and the investigation at issue, the

paragraph could not be more specific.  See United States v. Finnigin, 113 F.3d 1182, 1187 (10th

Cir. 1997).

> **3.      Correspondence to and from KOBAGAYA/KABAYA/LAZARE/LAZAR, related to, but not limited to fraudulently obtained government benefits, i.e. Social Security, Medicare, Medicaid, banks credit card companies, mortgage companies, social security statements, records, and information and certificates of title.**

This paragraph (severing the phrase "but not limited to" as discussed with respect to

paragraph 1, supra) could not be clearer in what it authorized Agent Larkin to search for –

evidence that he used his fraudulently-obtained identity documents to obtain benefits, such as

social security, medicare and medicaid, as well as his using his fraudulently-obtained documents

to secure mortgages, credit cards, and certificates of title.  In short, it authorized the agents to

seize some of the fruits of Defendant's criminal conduct, something wholly permissible under

the law.  See Zurcher v. Standford Daily, 436 U.S. 547, 554 (1978).  This paragraph is crystal

clear and specific.

Again, other than making bald statements, Kobagaya offers little to support his claim that

this paragraph lacks specificity.  He claims that the paragraph authorizes any seizure of any

correspondence or information from any bank or mortgage company.  (Def. Mtn. at 7).

Defendant's reading of the paragraph is without merit.  The warrant clearly authorizes seizure

only of those documents related to banks or mortgage companies where the defendant used his

fraudulently obtained documents to secure the credit card, mortgage, medicare benefit, or other

item in question.  That is, only those benefits that were derived from, or the fruits of, defendant's

criminal conduct could be searched.  Such limitations easily meet this Circuit's specificity

requirements.

**4.      Photographs, related to KOBAGAYA's activities and whereabouts during the Rwandan Genocide including but not limited to, still photos, negatives, video tapes, films, undeveloped film and the contents thereof, digital images, and slides.**

The fourth paragraph of the search warrant is also very specific.  It authorizes the seizure of photographs, and only those photographs that appear to document Defendant's whereabouts and activities during the Rwandan genocide.  Thus, the agents were clear in reading this paragraph that they could not seize any photograph, but only those that appeared to show where Kobagaya was during genocide, and/or what he was doing at that time.  Thus, the paragraph was very specific and very limited in scope.

Perhaps recognizing how limiting and specific this paragraph's language is, Defendant is reduced to complaining that the warrant somehow is defective because it "does not explain how the officer is to determine whether the photograph . . . was taken during a particular time frame." (Def. Mtn. at 7).  Not surprisingly, Defendant does not identify any authority for this seemingly newly-fabricated warrant requirement.  In any event, there is nothing to suggest that the agent should do anything other than use a common sense approach to viewing a photograph to determine whether or not it meets the proscriptions of the search warrant, such as looking for a date on the photograph, or a clue from the background to determine where and when it was taken, such as dress, foliage, presence of other individuals, etc.  Defendant does not argue otherwise.  His instant motion is thus without merit.

**6.      Any and all items and material reflecting KOBAGAYA's presence and/or residence in Rwanda, Africa during the time of the 1994 Rwandan Genocide, including, but not limited to newspaper clippings, souvenirs, mementos, memorabilia, personal effects, location of birth, employment, and service in the military, militia or any formal or informal armed group, any and all**

**items reflecting membership in, affiliation with or participation in any political group.**

This paragraph, as those in portions of paragraphs 2 and 4, addresses Defendant's whereabouts during the Rwandan genocide, and specifically is designed to cover material that would contradict defendant's false statement in his immigration forms that he lived in Burundi during the genocide.  Unlike paragraphs 2 and 4, however, this paragraph limits the seizure of items such as newspaper clippings, mementos, personal effects, or documents reflecting Defendant's participation in military or political groups.  Again, this paragraph is narrow and specific to a set of items that address one of Kobagaya's false statements, and focuses the seizure to only those items that deal with his presence in Rwanda during the 1994 genocide.

As with many of his other objections, Kobagaya simply disregards a common sense reading of the plain language of the paragraph.  He claims not to understand how newspaper clippings, souvenirs, mementos, or evidence of membership in military or political organizations could establish defendant's residence in Rwanda in 1994.  (Def. Mtn. at 8).  But such an assertion is wholly without merit.  Defendant's maintaining newspaper clippings about his or associates' activities in Rwanda in 1994, documents establishing his membership in Rwandan extremist political parties that gained prominence and power in 1994, as well as his membership in military organizations that carried out the genocide, would all be powerful evidence of his presence in Rwanda in 1994 and possibly his participation in the events at issue in this case.  Moreover, the affidavit made clear that there was probable cause to believe these very items would exist and be present in the residence.  Accordingly, there is no doubt that this paragraph meets the Tenth Circuit's particularity and specificity requirements.

5.      **Addresses and/or telephone books, Rolodex indices and any documents**

15

**reflecting names, addresses, telephone numbers, pager numbers, facsimile telephone numbers and/or telex numbers, and safes, including the contents within.**

**7.     Any and all items and materials reflecting the identity of parents, family, and relatives.**

Both of these paragraphs are quite specific, in that they limit the seizure of items to those that contain the identity of relatives or address/telephone contact information.  Defendant, in objecting to both paragraphs, makes no claim that the warrant is overbroad, but instead says little more than that he believes both to be unrelated to the crimes charged.  (Def. Mtn at 8).  However, in making these claims, defendant ignores the search warrant affidavit, and its setting forth probable cause to search these very records.  The affidavit makes clear that "[d]uring late June to early July of 1994, Kobagaya fled Rwanda, along with Bazaramba, and their respective families, in a two to three car caravan." (Aff. at ¶ 12).  This paragraph makes clear that other individuals, including family members witnessed Kobagaya's presence in Rwanda and his flight from Rwanda once the genocidal government was overthrown and the perpetrators forced into exile.   Thus, the affidavit sets forth a strong basis to for agents to search for the identities of these family witnesses and other individuals who observed Kobagaya, contrary to his sworn statements in immigration documents, present in Rwanda during the 1994 genocide, and even complicit in it, as evidenced from his flight when the genocide ended.  Thus, the affidavit provided probable cause and a firm evidentiary basis to search for and seize evidence that would bring these witnesses to light.  Not only does Defendant fail to contradict the statements in the affidavit supporting paragraphs 5 and 7, he does not even acknowledge the affidavit's existence.  His motion therefore is without merit.

**8.     Any and all materials which reflect the location of other storage areas**

16

**including, but not limited to: storage units, safe deposit boxes, and foreign residences.**

This paragraph is quite specific, and Defendant concedes as much by his silence. Rather, his only complaint is that this paragraph does not have "anything to do with the alleged crimes." (Def. Mtn. at 8). Of course, in making this claim, Defendant again appears to be making a claim that there is no probable cause to support a search for these items, rather than a claim that the paragraph does not sufficiently describe what it is to be searched. Nevertheless, the search warrant affidavit made clear that individuals like Kobagaya often secret many of the types of documents listed in paragraphs 1-7 in a "storage facility or safe deposit box." (Aff. at ¶ 26 c.). Accordingly, defendant's complaint is without merit.

*         *         *

In sum, each of the search warrant paragraphs clearly authorized the seizure of items described with the requisite level of specificity and particularity that it enabled Agent Larkin "to reasonably ascertain and identify the things authorized to be seized." Leary, 846 F.2d at 600. Further, the agents' execution of the warrant serves to underscore its specificity. The return only lists four categories of items seized. The first two were simply the defendant's passport, his I-551, and some related immigration documents. The final two were "mis. other documents," which consisted of letters written to Kobagaya in Kinyarwanda or Kirundi, and "mis photographs," which included photographs that appeared to be of Kobagaya in Rwanda in the apparent time period in question.[1] The Government has identified and provided to the defense

---

[1] The photographs seized by Agent Larkin were part of photo albums that included other photographs that the Government has no intention of using at trial.

17

every item seized pursuant to the search warrant, and other than some pornography,[2] Defendant

fails to identify any specific item that he contends was wrongfully seized.  In short, there was no

general search as described by Defendant, further undercutting his already tenuous argument.

Finally, even if the Court were to conclude that that the warrant or any of its paragraphs

was not specific enough, suppression is not appropriate as Agent Larkin seized the evidence in

this case in good faith.  See Guidry, 199 F.3d at 1155.  In this case, Agent Larkin helped prepare

the search warrant affidavit, he collected a great deal of the evidence referenced in the affidavit,

and what he did not personally collect he personally examined and reviewed, and of course he

personally executed the search warrant.  Accordingly, there is a very strong basis for the Court to

conclude that Agent Larkin acted in good faith in executing the warrant.  Id.  (In case where

warrant found to be overbroad, suppression denied "because [the executing agent] was so

intimately involved in the investigation prior to the execution of the warrant, and the preparation

of the affidavit in support of the warrant. This level of involvement in the case gave him obvious

knowledge of the crimes that were the subject of the investigation.").

Accordingly, for the reasons set forth above, the Government respectfully requests that

_____

[2] Defendant is correct that an agent seized pornography during the search.  When the agent encountered the material in defendant's home, it was in a covering with Defendant's name and address on it.  At the time, given the volume of correspondence to review, the agent could not ascertain whether this material was correspondence authorized by the warrant to seize or not; thus, he took the material back his ICE officer, where he opened the items and discovered that they were pornography, rather than correspondence.  That was entirely appropriate in this case.  See Hargus, 128 F.3d at 1363 (off-site review appropriate in certain circumstances).  With the nature of the material now apparent, neither the agent nor the Government believe that this material is authorized for seizure, and thus  the Government does not intend to introduce or make reference to this material in any matter during trial.  The Government is also ready to return the material at a time and manner acceptable to Defendant.

the Court deny defendant's motion to suppress in its entirety.[3]

## II.      The Agents Fully Complied with Fed.R.Crim.P. 41 and 18 U.S.C. § 3105

Kobagaya next contends that the warrant failed to comply with Rule 41 of the Federal Rules of Criminal Procedure and Title 18, United States Code, Section 3105 because "[t]wo unidentified Rwandan men who are not federal law enforcement officers were present and participated in the execution of the warrant." (Def. Mtn.  at 9-10).  Kobagaya's motion is simply wrong in that it ignores the relevant case authority and basic common sense concerning the execution of a search warrant that authorizes the seizure of only certain types of documents in a foreign language.  Defendant's motion should be rejected.

Federal Rule of Criminal Procedure 41 provides in pertinent part:

**(d) Obtaining a Warrant**

(2) Requesting a Warrant in the Presence of a Judge

(A) Warrant on an Affidavit.  When a federal law enforcement officer or an attorney for the government presents an affidavit in support of a warrant, the judge may require the affiant to appear personally and may examine under oath the affiant and any witness the affiant produces.

Moreover, Title 18, United States Code, Section 3105 provides:

A search warrant may in all cases be served by any of the officers mentioned in its direction or by an officer authorized by law to serve such warrant, but by no other person, except in aid of the officer on his requiring it, he being present and acting in its execution.

---

[3]Were the Court to conclude that some particular paragraph somehow failed the Tenth Circuit's particularity and specificity test, the Government requests that, because the search warrant is divided in easily severable numbered paragraphs, and the valid portions far outnumber any possible finding of an invalid portion, the Court uphold and allow to stand all of the valid portions of the warrant. See United States v. Sells, 463 F.3d at 1151; United States v. Kaufman, No. Crim. A. 04-40141-01, 2005 WL 2304345 (D. Kansas 2005) (Belot, J.).

As a threshold matter, there was no violation of Rule 41. Agent Larkin is a federal law enforcement officer. He applied for the warrant. He executed the warrant. And despite Defendant's unsupported intimations to the contrary, there is absolutely no requirement anywhere in Rule 41, or any other rule, that required Agent Larkin to list in his application the identity of every other law enforcement officer or contractor present during the search, and explain their function.[4]  Indeed, one circuit expressly has held that there is absolute no requirement that an agent obtain prior judicial authority before obtaining assistance – even from civilians – to execute a search warrant.  Belville v. Town of Northboro, 375 F.3d 25, 32-33 (1st Cir. 2004). Tellingly, defendant cites no rule or authority to the contrary.

Not only do Kobagaya's claims have no basis in fact, they are also have no basis in law. The Tenth Circuit has made it clear that "violations of Rule 41 alone should not lead to exclusion unless (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." United States v. Pennington, 635 F.2d 1387 (10th Cir. 1980) (quoting United States v. Burke, 517 F.2d 377, 386 (2d Cir. 1975) (evidence not suppressed even though the warrant was directed to state police rather than a federal officer, commanded search to take place within reasonable time rather than 10 days, warrant was executed solely by state police, and warrant provided for return to issuing judge rather than

---

[4]To the extent Defendant is arguing that there is somehow some significance that Agent Larkin did not make a report describing the hiring of interpreters, Defendant fails to identify any authority requiring such a report.  Moreover, given the extraordinary discovery Defendant has been provided to date, it is unfair for Defendant to claim the absence of a document in pretrial discovery, one that was never created or required to be created, has any kind of evidentiary significance, thus somehow transforming his motion into some type of summary judgment motion akin to Federal Rule of Civil Procedure 56.

federal magistrate)); see also United States v. Pangburn, 983 F.2d 449 (2d Cir. 1993); (Rule 41 motion denied despite the fact that non-federal agent, accompanied by assistant United States attorney, applied for federal search warrant before federal magistrate, and federal search warrant executed solely by non-federal agents).

Neither of these situations is present here – indeed, Defendant does not even assert that they are – and therefore suppression is not appropriate.  First, assuming that there was a Rule 41 violation in this case, and there was not, Kobagaya has not claimed, nor could he, that a search warrant would not have been issued in this case but for the alleged violation.  Agent Larkin would have obtained this warrant with or without the presence of an interpreter during its actual execution.  Nothing in the record contradicts that.

As to the second prong in Burke, there is no evidence of intentional and deliberate disregard of any provision of Rule 41.  Agent Larkin went before Magistrate Judge Bostwick and fulfilled all of the requirements, to the best of his knowledge and ability, for completing the steps necessary to obtain and execute a search warrant.  Kobagaya cannot argue to the contrary in good faith.

Moreover, there was no violation of Section 3105. Federal constitutional law does not prohibit the use of civilians in searches. In fact, Congress has explicitly authorized the practice, see 18 U.S.C. § 3105, and courts have repeatedly upheld the practice. See, e.g., Belville v. Town of Northboro, 375 F.3d at 33 (agents permitted to use civilians to assist with technical aspects of search); Bills v. Aseltine, 958 F.2d 697, 706 (6th Cir.1992) ("Police may constitutionally call upon private citizens to assist them, and where assistance is rendered in aid of a warrant ... the bounds of reasonableness have not been overstepped."); United States v. Clouston, 623 F.2d 485,

486-87 (6th Cir.1980) (upholding search in which federal agents brought telephone company employees with them on a search to identify stolen property). Of course, the civilian must have been serving a legitimate investigative function. Town of Northboro, supra. It is impermissible, for example, for a civilian to "ride along" with officers in furtherance of his own private interest. See Wilson v. Layne, 526 U.S. 603, 613-14 (1999) (holding that officers violated a defendant's Fourth Amendment rights by inviting a news crew along on a search); Buonocore v. Harris, 65 F.3d 347, 356 (4th Cir.1995) ("[W]e have no doubt that the Fourth Amendment prohibits government agents from allowing a search warrant to be used to facilitate a private individual's independent search of another's home for items unrelated to those specified in the warrant. Such a search is not 'reasonable.'"); Bills, 958 F.2d at 702 (suppressing evidence discovered by a security guard who "was present, not in aid of the officers or their mission, but for his own purposes involving the recovery of ... property not mentioned in any warrant"). Also, the officers must have some demonstrable need for the presence of the civilian. United States v. Sparks, 265 F.3d 825, 832 (9th Cir. 2001) ("Police cannot invite civilians to perform searches on a whim; there must be some reason why a law enforcement officer cannot himself conduct the search and some reason to believe that postponing the search until an officer is available might raise a safety risk.").

Here, Agent Larkin enlisted the aid of the two civilian employee/contractors for a legitimate purpose for which there was an undeniable, demonstrable need. The two law enforcement employee/contractors, both of whom are American citizens, provided interpretation and translation services. One individual was present to translate for Kobagaya - to explain to him in his native language what was going on, to translate the search warrant if necessary, and of

course, while present, to see if he made any statements to law enforcement or anyone else.  The second law enforcement employee/contractor was present to review items identified by agents that were in the Rwandan language Kinyarwanda or in the related language of neighboring Burundi (Kirundi) to determine if they might fit the narrow search authority provided by the warrant.   Neither was present to search for evidence, and neither did so.  Rather, both law enforcement employee/contractors were simply aiding Agent Larkin and his partners during the execution of the warrant by providing interpretation and translation services, exactly the type of assistance contemplated by Section 3105 and the case authority set forth above.  Indeed, Defendant's claims regarding these interpreters' presence are particularly empty given his complaints that the search warrant was somehow a "general search."

In sum, the two American law enforcement contractors, who provided translation services for ICE, were clearly present during the search "in aid of the officer" executing the warrant.  18 U.S.C.  § 3105.  Indeed, it should be no surprise to Defendant, or the Court, that where a search warrant contemplated the seizure of items in a foreign language, that law enforcement would employee contractors to translate and interpret items to ensure that only those documents that meet the search warrants narrow seizure authority are actually taken.  Those precautions were taken in this case, and Kobagaya should not be heard to complain that they were.

**CONCLUSION**

For the reasons set forth above, Defendant's motion to suppress should be denied in its entirety.

Respectfully submitted,

s/Steven C. Parker
STEVEN C. PARKER
Senior Trial Attorney
Office of Special Investigations
Department of Justice
Criminal Division
John C. Keeney Bldg., Suite 200
10th & Constitution Ave., N.W.
Washington, DC 20005
(202) 514-5792
Steve.parker2@usdoj.gov

Date: February 22, 2010

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 22, 2010, I electronically filed the foregoing

Government's Response In Opposition To Defendant's Motion To Suppress with the Clerk of

the Court by using the CM/ECF system which will send a notice of electronic filing to the

following:

Kurt P. Kerns
Ariagno, Kerns, Mank & White, L.L.C.
328 N. Main Street
Wichita, KS 67202

Melanie Morgan
Morgan Pilate, L.L.C.
142 North Cherry Street
Olathe, KS 66061

*Attorneys for Defendant*

s/Steven C. Parker
STEVEN C. PARKER

25