IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

UNITED STATES OF AMERICA,
           Plaintiff,

v                                            Case No. 09-10005-01-MLB

LAZARE KOBAGAYA
           Defendant.
_____

**DEFENDANT'S RESPONSE IN OPPOSITION TO GOVERNMENT'S MOTION TO EXCLUDE TESTIMONY OF DR. FILIP REYNTJENS**

The defense respectfully submits this response to the government's motion to exclude the testimony of Dr. Filip Reyntjens (Doc. 114). For the reasons set forth more fully in this response, the government's motion should be denied. First, the government broadly characterizes the opinions voiced in Dr. Reyntjens report into two categories - the first addressing the credibility of the witnesses, the second addressing the fair trial system in Rwanda. It contends that the first category of opinion is outside the scope of proper expert testimony or in the alternative, lacks proper foundation. The defense does not intend to ask Dr. Reyntjens to opine about the credibility of any witness. That opinion was made part of the report and disclosed to the government because it is intended to be used for purposes of the defense motion to dismiss[1] which is currently pending. The second category of opinion relative to the judicial system in Rwanda is relevant because it puts into context the lack of recourse or protection a witness would

---

[1] See *Motion and Memorandum to Dismiss the Indictment Based on Due Process Violations in the Fundamentally Unfair Investigation and Prosecution of Lazare Kobagaya* (Doc. 105).

1

have if subjected to persecution by the Rwandan government for expressing an opinion contrary to law.  Because the government contends that Dr. Reyntjens testimony should be excluded *in toto*, this response clarifies the purpose of Dr. Reyntjens testimony at trial and the propriety of its admissibility under the Federal Rules of Evidence 104, 403 and 702 and *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579 (1993) and its progeny.

I.   **The Legal Framework for Determining the Admissibility of Expert Testimony Requires Such Evidence to be Relevant, Reliable and Helpful**

The Federal Rules of Evidence work in conjunction with one another to determine the admissibility of all evidence.  The starting point for determining whether any type of evidence is admissible is relevant.  "Relevant evidence" of course is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probably or less probably than it would be without the evidence."  F.R.E. Rule 401.  All relevant evidence is admissible unless otherwise prohibited by rule, statute or constitutional provision.  F.R.E. Rule 402.  The basic standard of relevance is a liberal one. *Daubert*, 509 U.S. at 587.

Expert testimony imposes two other requirements beyond relevance - reliability and helpfulness.  Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This rule codifies the standards for *all* types of expert testimony announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co., v. Carmichael*,

119 S.Ct. 1167 (1999) and provides general standards that the court must use to assess the reliability and helpfulness of the expert testimony.  *See* F.R.E. 702, Advisory Committee Notes, 2000 Amendments.   Relevancy is built into the rule as it requires that the expert testimony assist the trier of fact to understand the evidence or to determine a fact in issue.

The trial court determines the admissibility of evidence.  F.R.E. Rule 104(a).  Significantly, the rule does not limit the right of a party to introduce before a jury evidence relevant to the *weight to be given to the evidence* or *credibility of a witness*.  F.R.E. Rule 104(e).  Indeed, admission of evidence regarding the credibility of a witness is specifically contemplated by F.R.E. Rule 608(a).   Under Rule 702, there is no categorical exclusion of evidence such as the credibility of a witness.  See *United States v. Adams*, 271 F.3d 1236, 1245 (2001) (acknowledging that *Crane v. Kentucky*, 476 U.S. 683, 106 S.Ct. 2142 (1986) prohibits categorical exclusion of expert testimony regarding the credibility of witnesses; the test for admission is the federal rules of evidence).

Credibility of a witness is always relevant.  The test is whether scientific, technical or other specialized knowledge offered by the expert *can assist* the jury in making a credibility assessment.  To that end two cases are particularly illuminating.  In *United States v. Shay*, 57 F.3d 126 (1st Cir. 1995), the government alleged that Shay conspired with a friend to kill Shay's father by blowing up his car.  *Id*. at 128.  The government's primary evidence was several incriminating statements that Shay made after the bombing.  *Id*. at 128.  As part of his defense, Shay attempted to call a psychiatrist to demonstrate that Shay suffered from a recognized medical disorder, which is commonly characterized as an extreme form of pathological lying.  *Id*. at 129.  The district court excluded the evidence under Rule 702, concluding that the jury was capable of

determining the reliability of Shay's statements without the testimony, in light of other evidence in the record concerning the reliability of the statements. *Id*. at 130. Following a jury trial, he was convicted. *Id*. at 128. The Court of Appeals, in concluding that it was clear error for the expert evidence to be excluded, reasoned that regardless of whether the jury had the capacity to *generally* assess the reliability of Shay's statements in light of other evidence in the case, the jury was unqualified to determine without expert assistance the *particular* issue of whether Shay may have made false statements because he suffered from a mental disorder. *Id*. at 133.

The Seventh Circuit followed a similar line of reasoning in *United States v. Hall*, 93 F.3d 1337 (7th Cir. 1996). The defendant in that case was convicted following a jury trial of kidnaping the victim for purposes of sexual gratification and transporting her across state lines. Id. at 1340. The evidence against him consisted of his confession and Rule 404(b) evidence. Hall's defense was that "due to a personality disorder that makes him susceptible to suggestion and pathologically eager to please, he "confessed" to a crime that he did not really commit, in order to gain approval from the law enforcement officers who were interrogating him." *Id*. at 1341. The district court limited or excluded testimony from several experts who would have testified regarding Hall's condition, false confessions and the connection with particular interrogation techniques.

Specifically, the trial court excluded the testimony of a social psychologist expert in the field of coercive police interrogation techniques and the phenomenon of false or coerced confessions. In the proffered testimony, the expert described that false confessions exist, that individuals can be coerced into giving false confessions and that certain indicia can be identified to indicate when they may occur. The expert further described his methodology generally and

4

the factors that experts in the field rely upon to reach their conclusions. In excluding the evidence, the trial court concluded that the expert would have to judge the credibility of the law enforcement officers in conducting the interrogation which was improper and ultimately the testimony added nothing to what the jury would know from common experience. *Id*. at 1341.

The Court also limited the scope of an examining psychiatrist who was permitted to testify only about Hall's mental condition. Had be been permitted, the psychiatrist would have testified about the defendant's "susceptibility to various interrogation techniques, the propriety of suggesting answers to Hall and Hall's capability of confessing to a crime that he did not commit." *Id*. at 1341.

The exclusion and/or limitation of each expert's testimony was found to be error. Because juries are unlikely to know that personality disorders exist which can cause individuals to make a false confession, this evidence would have assisted them in making a decision. *Id*. at 1345. Moreover, the testimony from the two experts worked together to link the identified condition with the defendant. Once the jury had the information, it was up to the jury to decide how much weight, if any to give the expert testimony. *Id*. at 1345.

The decisions in *Shay* and *Hall* demonstrate that admission of expert testimony is not only appropriate but required as long as the information will assist jurors.

In past cases, the Tenth Circuit has stated that districts court may not categorically exclude all expert testimony regarding credibility issues yet notes that "the credibility of witnesses is generally not an appropriate subject for expert testimony." See *United States v. Benally*, 541 F.3d 990, 994 (10th Cir. 2008) (citing *United States v. Adams*); *United States v. Adams*, 271 F.3d 1236, 1244-45 (10th Cir. 2001) (citing *United States v. Toledo,* 985 F.2d 1462

(10th Cir. 1993)). The *Toledo* case is a pre-*Daubert* case which relied on *United States v. Samara*, 643 f.2d 701, 705 (10th cir.), *cert. denied* 454 U.S. 829, 102 S.Ct. 122 (1981) and *United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988) to identify three concerns regarding expert testimony on credibility. Those concerns include 1) whether the testimony could usurp a critical function of the jury; 2) whether the testimony is unhelpful because of the jury's ability to assess credibility; and 3) the potential for undue prejudice and influence on the jury when impressively qualified experts testify on the credibility of other witnesses. *Toledo*, 985 F.2d at 1470. The government attempts to use this proposition and the underlying concerns, as a basis for excluding the proposed expert testimony. Reliance on this statement, as if it makes some sort of exception for credibility evidence, is completely misplaced. The teachings of *Daubert* and *Kumho Tire Company* make absolutely clear that the standard for expert testimony is Rule 702 in conjunction with the other rules of evidence and it has nothing to do with the type or category of evidence. There is simply nothing within the rules themselves that suggest credibility evidence is an inappropriate subject for expert testimony. Bias of a witness is always relevant and of constitutional import. "A successful showing of bias on the part of a witness would have a tendency to make the facts to which he testifies less probable in the eyes of the jury than it would be without such testimony. *United States v. Abel*, 469 U.S. 45, 51, 105 S.Ct. 465 (1984); *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105 (1974) (the Sixth Amendment requires the defendant to have an opportunity to show bias on the part of the prosecution witnesses).

  Moreover, the accuracy of this generalized proposition is somewhat dubious. It can be traced back to *United States v. Toledo* which relied on *United States v. Samara*, 643 F.2d 701, 705 (10th Cir. 1981). In *Samara*, the expert testimony which was excluded was that of an

accountant for the defense who had prepared a summary of items that the expert concluded should excluded from the government's calculation of gross receipts.  The expert's basis for exclusion however was simply that he did not believe the witness who were supplying the information regarding gross receipts because of felony convictions or lack of documentation.  In that situation, the evidence was properly excluded because the expert had weighed the evidence and made a finding that it wasn't credible.  *Id*.   Under those circumstances, certainly the expert testimony was improper.  However, it doesn't merit the generalization that credibility is generally not an appropriate subject for expert testimony.

     As to the specific concerns with expert testimony on credibility issues, each concern can be address with reference to the Rules of Evidence themselves.  With respect to whether the testimony could usurp a critical function of the jury, the test under Rule 702 is whether the testimony can assist the trier of the fact.  Thus, testimony that tells the jury that they *must* think a certain way usurps the function of the jury.  However, testimony that simply gives the jury something to consider *not within their common knowledge* as the jury weighs the reliability or credibility of the evidence does not usurp a critical function.   The second concern is that the jury is capable of assessing credibility.  Again, the test under Rule 702 is whether the specialized knowledge will assist the juror.  Thus, the question is not whether the jury can assess credibility generally but rather there is some particular information, pertinent to that assessment, that only an expert could provide.  The third concern is whether the expert testimony, simply because of the impressive qualifications of the person providing the testimony, is prejudicial and can unduly influence the jury.  This is actually a Fed. R. Evid. 403 question which requires the Court to assess, after determining under Rule 702, the prejudicial impact of the testimony.

Thus, the proper framework for determining the admissibility of the expert testimony at hand are Rules 702 and 403 .

## II. The Purpose of Dr. Reyntjens Testimony is to Demonstrate Potential Bias of the Government Witnesses from Rwanda

Very simply put, the purpose of Dr. Reyntjens testimony is to demonstrate the potential bias of the government witnesses from Rwanda which stems from their citizenship or residence in Rwanda, which is politically oppressive, at least when it comes to the topic of genocide.  The concerns the defense has about the government witness testimony is more thoroughly developed in its *Motion to Dismiss Indictment*, incorporated here by reference.  Apparently the government does not take issue with Dr. Reyntjens qualifications as an expert in Rwandan political science and law but rather questions the conclusions he reaches.  Undoubtedly Dr. Reyntjens opinions are very strong but it should be noted that the reported generated and disclosed on January 4, 2010 was for the dual purpose of a motion to dismiss (currently pending) as well as for use at trial.  Accordingly, some of the opinions will only be elicited at a motions hearing.  For example, the defense does not intend to ask Dr. Reyntjens if he believes Witness A (or any other government witness).

What the defense does intend to elicit is a history of Rwanda from the pre-genocide times to present day including the current state of political and legal affairs to demonstrate the bias of each government witness.  Through that evidence, the defense will establish that what happened during the 100 day window April through June 1994 was the culmination of a four-year civil war between competing political interests, the collapse of the Rwanda government and the take over of the government by the RPF-led Paul Kigame.  Dr. Reyntjens can testify to the scientific and

8

political data which supports that more than just a genocide was occurring during the time period at issue.

While hundreds of thousands of Tutsis died during this time period, hundreds of Hutus were also killed both before, during and after this time period.  The current government (the RPF) takes credit for ending the genocide of the Tutsis and as such, has used that as a means for justifying and promulgating the legitimacy of its political authority in post-genocide and present day Rwanda.  The RPF has been responsible for, although not accountable for, massive numbers of killings of Hutus, continued human rights violations and perpetuating extreme discrimination between Hutus and Tutsis.   The government witnesses are either Hutu or Tutsi.  This discrimination between the groups is a form of bias that a jury is entitled to consider but would not have knowledge about without the aid of an expert.  This is relevant for at least two reasons.  First, it negates the intent element of genocide (although Mr. Kobagaya strongly denies being involved in any of the underlying acts of which he is accused).  Second, it explains the current social and political climate in Rwanda.  Details of social hierarchy and political organization and structure at all levels of government (local and national) are relevant because they contradict the government's claim that Mr. Kobagaya, because of his heritage (Hutu), relative wealth and age, was a person of significant political influence in the community.

Further, Dr. Reyntjens will testify that the form of government in Rwanda is a dictatorship and that the law and judiciary has been used as a mechanism for silencing opposition.   Dr. Reyntjens will provide testimony regarding the Rwandan laws of divisionism and genocide ideology and how they are enforced.   He will also discuss the creation of the gacaca courts to prosecute only Hutu's for genocide and/or war crimes and how that system

creates a gross disparate treatment of Hutus and perpetuates the idea of invincibility behind the Tutsis.  Further, the court system does not employ universally accepted procedures of fundamental fairness and due process such a right to counsel, double jeopardy.  This is relevant for multiple reasons.  One, some of the government witnesses have been accused and/or convicted within the gacaca system.  Because the system is so fundamentally different than any judicial system we have in the United States, it requires expert testimony to explain what happens in the gacaca process.  One of the things that happens is that persons within the system must implicate someone else.  This goes far beyond any traditional notion of "snitching."  Second, the potential consequence to persons who are willing to speak regarding genocidal ideology is imprisonment or other human rights violations without meaningful protection or recourse by, from or through the judicial branch.   Again, this is contrary to the American experience where if the executive branch exercises undue authority, the remedy is through the court system.  It demonstrates the bias a witnesses who testifies under these conditions may have to avoid these consequences.

   Even if expert testimony is admissible under F.R.E. 702, the Court still must consider whether its probative value is substantially outweighed by its unfair prejudice.  F.R.E. 403.  "Unfair prejudice" means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  See F.R.E. 403, Advisory Committee Notes.   Without the testimony by Dr. Reyntjens, the jury would be left with the inaccurate belief that there are no out-of-the-ordinary repercussions for any of the testifying witnesses.   In an ordinary criminal case, the jury would receive an instruction from the Court regarding the credibility of witnesses.  See 10th Cir. Pattern Instruction 1.08.   That instruction suggests that the

jury answer the following question, among others, "Did the witness have any particular reason not to tell the truth?" An ordinary juror couldn't possibly begin to understand the conditions in Rwanda and answer that question without the assistance of Dr. Reyntjens. At this time, the defense does not intend to ask Dr. Reyntjens to opine on the specific credibility of any one witness[2]. Accordingly, because he is not assessing the witnesses credibility nor telling the jury what they should or should not believe but simply providing them with specialized knowledge that will assist them in making their own decision, the probative value substantially outweighs any prejudice.

### III.   Dr. Reyntjens Testimony is Relevant, Reliable and Helpful and Therefore Admissible

When the opponent of expert testimony challenges its admission under Rule 702, the court must consider whether it is admissible through a hearing pursuant to Rule 104. The defense intends to offer the testimony[3] of Dr. Reyntjens which will describe in detail not only his qualifications, the methodology used to gather data, as well as the data[4] itself used to generate his opinions relative to this case. Dr. Reyntjens specialized knowledge about Rwanda, including its

---

[2]   Dr. Reyntjens has not been provided with information about specific witnesses, in part because the defense did not have that information until after it was required to disclose Dr. Reyntjens report. In the event Dr. Reyntjens has additional knowledge about a specific witness which would justify another opinion, the defense will provide that to the government under its continuing obligation regarding reciprocal discovery.

[3]   Dr. Reyntjens, who is a citizen of Belgium, is unavailable to testify in the United States. Accordingly, by separate motion the defense will be requesting to take Dr. Reyntjens deposition pursuant to Fed. R. Crim. Proc. 15.

[4]   Dr. Reyntjens incorporates much of this data and the methodology by which he obtained it by reference in his report to the dozens of publications and articles he has authored on the topic. It will be elaborated upon during the presentation of his testimony.

culture, law and politics, allows him to provide information to the jury about the conditions Rwandans are exposed to which could impact their ability to accurately account for what transpired. The defense believes that after hearing from Dr. Reyntjens, this Court will find that Dr. Reyntjens is a qualified expert, that his specialized knowledge will assist the jury to determining whether any government witness has any bias and that the knowledge he has to share is based on a proper methodology which generated the data upon which he formulates his opinions. Furthermore, the probative value of his testimony outweighs any undue prejudicial impact under Rule 403. Accordingly, the defense requests that the government motion be denied.

Respectfully Submitted,

ARIAGNO, KERNS, MANK & WHITE, LLC.

/s/ Kurt P. Kerns
_____
By: Kurt P. Kerns, KS No. 15028
328 N. Main Street
Wichita, KS 67202
Telephone: 316-265-5511
E-mail: kurtpkerns@aol.com

And

/s/ Melanie S. Morgan
_____
By:    Melanie S. Morgan, KS No. 16088
Morgan Pilate LLC
142 N. Cherry Street
Olathe, KS 66061
Telephone: 913-829-6336
E-mail: mmorgan@morganpilate.com

                              Attorneys for Lazare Kobagaya

## CERTIFICATE OF SERVICE

I, Melanie S. Morgan, do hereby certify that a true and accurate copy of the foregoing was served on opposing counsel and counsel of record by the ECF system on March 22, 2010.

                              __/s/ Melanie S. Morgan_____
                              Melanie S. Morgan