**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 09-10005-01-MLB |
| | ) | |
| LAZARE KOBAGAYA, | ) | [REDACTED PER COURT ORDER] |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM AND ORDER ON
MOTION TO QUASH SUBPOENA**

Presently before the court are the following motions and related briefs:

1. Motion of Third Parties Human Rights Watch and Dr. Timothy Longman to Quash Subpoenas Duces Tecum Served by Defendant (Doc. 135) and supporting Memorandum (Doc. 136);

2. Government's Objection and Motion to Quash Defendant's Subpoena Duces Tecum Pursuant to Federal Rule of Criminal Procedure 17(c) (Doc. 138);

3. Defendant's Consolidated Response in Opposition to Motions to Quash Subpoenas Submitted by Timothy Longman, Human Rights Watch and the Government (Doc. 142); and

4. Reply Memorandum by Third Parties Human Rights Watch and Dr. Timothy Longman. (Doc. 152.)[1]

---

[1] In citing to documents filed of record, the court will refer to the page number assigned to the pleading by the CM/ECF filing system.

The above motions were discussed at the status conference of April 28, 2010, with the Government and Defendant's counsel. Counsel sought early resolution of these motions and due to the fact that the assigned trial judge, the Honorable Monti L. Belot, is in a multi-week criminal trial, he inquired if the parties would consent to have the matter heard and ruled on by the undersigned magistrate judge. Both counsel announced that they would so consent. After coordination with the parties and the third-party movants, a notice of hearing was issued on May 6, 2010, setting the motion hearing for May 11, 2010 at 2:00 p.m.

At the May 11, 2010 motion hearing, the following counsel appeared: Christina Giffin and Robert Thomson, U.S. Department of Justice, for the Government; Kurt P. Kerns for Defendant Lazare Kobagaya;[2] and Jerome T. Wolf and Daniel Morris of Sonnenschein, Nath & Rosenthal, LLP-KC, for Third-Party Movants Human Rights Watch (hereafter referred to as "HRW") and Dr. Timothy Longman (hereafter referred to as "Longman").[3]

All counsel were initially asked if they had evidence to present other than

---

[2] Defendant has filed a waiver of appearance as to his attendance at this motion hearing. (Doc. 156.)

[3] At the hearing, counsel for HRW and Longman acknowledged that their position concerning the motion to quash and their legal arguments are identical. Accordingly, unless it is necessary to separately identify one or the other, the court will refer to them jointly as "HRW."

the attachments and/or affidavits to their previously filed motions, responses and replies. Defendant proffered four exhibits marked Defendant's Ex's A through D for use at the hearing. After allowing time for review of the exhibits, no counsel objected to the use of these exhibits for purposes of this hearing. These exhibits had been previously produced pursuant to a protective order and are to be filed under seal.

## I. THE MAGISTRATE JUDGE'S JURISDICTION TO HEAR AND DECIDE THE MOTIONS TO QUASH.

As previously noted, during the April 28, 2010 status conference the Government and Defendant's counsel both consented to have this motion heard and ruled on by the magistrate judge. However, because counsel for HRW and Longman were not present at the April 28 status conference, the court first addressed with the parties the issue of the jurisdiction of the magistrate judge to hear and rule on the motions to quash a subpoena in this criminal case.

Pursuant to 18 U.S.C. § 636(b)(1)(A), a judge may designate a magistrate judge to hear and determine any pretrial matter pending before the court with certain specifically designated exceptions. A motion to quash a subpoena under Fed. R. Cr. P. 17(c) is not one of the designated exceptions. *See also* D. Kan. Rule 72.1.1(c) (a magistrate judge may hear and determine any procedural or discovery

motion or other pretrial matter in a civil or criminal case other than the motions specified in D. Kan. Rule 72.1.1(d)).   Furthermore, a magistrate judge may be assigned such additional duties as are not inconsistent with the Constitution and laws of the United States.  18 U.S.C. § 636(b)(3).  *See also* D. Kan. Rule 72.1.1(i) (authority to perform additional duties, including issuance of subpoenas).   Under the additional duties clause, the court applies both a statutory test and a Constitutional test to determine whether assignment of additional duties to a magistrate judge is authorized.  Under the statutory test, the court must determine if the additional duty bears some reasonable relation to the specified duties which may be assigned to magistrate judges under the Federal Magistrates Act.  U.S. v. Mendez-Lopez, 338 F.3d 1153, 1158-59 (10th Cir. 2003).  Ruling on motions to quash subpoenas is the type of work normally handled by a magistrate judge when pretrial matters are referred in civil cases.  Therefore the statutory test is met in this case.  Under the Constitutional test, the court must determine whether, even if the task is authorized, it impinges on a criminal defendant's constitutional rights to have an Article III judge preside over all critical stages of a felony trial.  *Id.* However, if the defendant does not object to the delegation of authority and actions actually taken by the magistrate judge, no constitutional rights are implicated.  *Id.*

At the hearing , the Government restated its consent to have the motion

heard and ruled on by a magistrate judge as did counsel for defendant.  However, since the consent was given by defendant's counsel at the April 28, 2010 status conference where defendant was not present but had waived his appearance (Doc. 131), and because defendant was not present at the May 11, 2010 motion hearing, the court directed defendant's counsel to obtain a written consent by defendant to having the motion to quash heard and decided by a magistrate judge.  This is appropriate to assure that defendant has given his consent to this procedure.  *See e.g.,* U.S. v. Mendez-Lopez, 338 F.3d at 1158 n. 4 (refusing to reach the issue of whether defense counsel's consent is sufficient to have a magistrate judge handle questions from the jury).  Defendant's counsel has now filed a written waiver executed by defendant Lazare Kobagaya consenting to have the magistrate judge hear and rule on this motion to quash.  (Doc. 160.)

Upon inquiry by the court, movants HRW and Longman consented to have their motion heard and ruled on by the magistrate judge, but wanted to assure that they retained the right  to seek reconsideration pursuant to 28 U.S.C. § 636(b)(1)(A).  Because the court determines that the magistrate judge has the jurisdiction to hear the present motions pursuant to 28 U.S.C. § 636(b)(1)(A) and (b)(3), the matter will be decided by a memorandum and order rather than by a report and recommendation under 28 U.S.C. § 636(b)(1)(B).  As such, all parties

have the right to seek reconsideration from the assigned trial judge pursuant to 28 U.S.C. § 636(b)(1)(A) to determine whether the magistrate judge's order is "clearly erroneous or contrary to law."

## II.    THE GOVERNMENT'S OBJECTION AND MOTION TO QUASH.

The Government's objection was limited to that portion of the subpoena served on their expert witness, Longman, which seeks any documents over and above the materials belonging to HRW, related to Longman's expert report prepared for the Government.[4]  (Doc. 138 at 2.)  The Government announced at the hearing that this issue had been resolved and Defendant's counsel agreed that he had dropped this request.  *See e.g.*, Doc. 142 at 2 ("To the extent that the government believes that the request is overbroad, the defense clarifies that the request does not extend to all documents possessed by Longman but simply those obtained in conjunction with his research in Nyakizu while working with HRW on the *Leave None to Tell the Story* project.")  Therefore the Government's Objection and Motion to Quash (Doc. 138) is MOOT.

## III.    HRW AND LONGMAN'S MOTION TO QUASH THE SUBPOENAS

---

[4]  This is covered by paragraph 2 in the subpoena to Longman which seeks "[i]dentification and production of any additional material relied upon in formulating Dr. Longman's expert opinion in United States v. Kobagaya.  (Doc. 135-2.)

**A.     Background facts.**

HRW is an international human rights organization that works to investigate
and expose human rights violations throughout the world, including documenting
the genocide in Rwanda.  HRW is also a major publishing company that issues
research reports describing particular human rights abuses in various parts of the
world and recommending specific steps to end those abuses.  (Doc. 136-3 at 2.)
HRW sends copies of its reports to policymakers, government officials, journalists,
scholars and other non-governmental organizations and maintains a regular
subscriber list.  Almost all of HRW's current reports, briefing papers and news
releases are published on its website, including the report on Rwanda entitled
*Leave None to Tell the Story,* and may be viewed without charge.[5] (Doc. 136-3 at
3.)

Dr. Longman is a former researcher for HRW who is now the director of the
African Studies Center at Boston University.  (Doc. 136 at 3.)  Longman was the
director of HRW's field office in Rwanda in 1995-96, and he wrote the chapters on

---

[5] The book *Leave None to Tell the Story*, was published by HRW in March 1999
with material added April 1, 2004, and is available on HRW's website at
http://www.hrw.org/legacy/reports/1999/rwanda/rwanda0399.htm.  The chapters on
Nyakizu are located at http://www.hrw.org/legacy/reports/1999/rwanda/Geno8-10-03.htm
and http://hrw.org/legacy/reports/1999/rwanda/Geno8-10-05.htm. (May 11, 2010).

Nyakizu in the book *Leave None to Tell the Story*. (Doc. 115-2, at ¶¶ 1, 4.)[6] Longman has been retained as a paid expert witness to testify in this case and he has submitted a summary expert report. (Defendant's Ex. C.)

The source materials that HRW researchers and staff generate are HRW's, and although copies of them may be used under arrangement with HRW for former researchers such as Longman, ownership remains with HRW. (Doc. 136-3 at 10.) The record is silent as to the terms of any such arrangement between HRW and Longman concerning materials used by him in connection with preparation of the Nyakizu chapter of the book *Leave None to Tell the Story*.

The Government and HRW both state that Longman's expert testimony will be limited to a "general background discussion of the genocide events in Rwanda" (Doc. 136 at 6, 13) and "to establish the background and framework necessary for the jury to understand the Rwandan genocide in general, and in Nyakizu Commune in particular." (Doc. 138 at 4.) In effect, Longman's expert report appears to be a summary of the Nyakizu chapters in the book *Leave None to Tell the Story.* That book is based in large part on HRW interviews conducted in Rwanda, mostly in 1994-1996. In fact, of the 159 footnotes to the first Nyakizu chapter of the book,

_____

[6] This information is from the Rebuttal Declaration of Dr. Timothy Longman in connection with another pending motion.

approximately 112 cite directly to HRW interviews in Rwanda by date of interview. Some footnotes also reference related sources such as "Field Notes, Human Rights Watch and FIDH researchers, August 10 and 15, 1995." While HRW states that the documents sought are merely raw summaries of confidential interviews, many of which could not be authenticated by Longman, (Doc. 136 at 14), it appears from a review of the relevant Nyakizu chapters of the book that the documents are more than "summaries" since there are many specific and lengthy quotations in the chapters that are attributed to specific interviews.

The driving issue for HRW relates to maintaining the confidentiality of its sources of these interviews who were assured of confidentiality. Affidavits attached to the motion also outline HRW's experience with its attempt to gather information in foreign countries, including Rwanda, and describe the training it gives its field researchers to protect the identity of any persons interviewed. (Doc. 136-2 at 4-6; Doc. 136-3 at 7-9) The affidavits also describe HRW's past experiences with threats, harassment and violence toward witnesses who come forward to talk about the genocide in Rwanda, both prosecution and defense witnesses, and urge caution in handling any information capable of providing clues on the identity of witnesses or victims approached by HRW. (Doc. 136-1 at 2-7.) HRW's position is summarized by one of the affiants who concludes that

> data that could lead to the identification of witnesses who
> request confidentiality in cases related to genocide
> collected in the field by HRW's researchers should be
> kept confidential due to the fact that any disclosure
> thereof may open the floodgates to all sorts of threats and
> harassment affecting the witnesses and genocide
> survivors who were the subjects of HRW's interviews.

(Doc. 136-1 at 6-7.)

**B.      HRW's Legal Arguments.**

      1.      The *ex parte* Procedural Argument.

      HRW initially argued that defendant had not obtained a court order

authorizing the issuance of a subpoena.  (Doc. 136 at 8-10.)  Defendant responded

that he had filed an *ex parte* motion under seal requesting issuance of the

subpoenas (Doc. 118)(Ex Parte)(Sealed) and had obtained an order from Judge

Belot authorizing such subpoenas which was also filed *ex parte* and under seal.

(Doc. 121)(Ex Parte)(Sealed).  In reply, HRW then argued that it was improper for

defendant to use an *ex parte* filing and to fail to advise the court that the parties to

whom the subpoena was to be issued were represented by counsel.  (Doc. 152 at 3-

4.)  Therefore, HRW argued that the court should evaluate the propriety of the

subpoenas *de novo* since they had not had a prior opportunity to appear and oppose

the issuance of the subpoena.

      At the May 11 hearing, the court inquired if this issue was now moot since

HRW and Longman were enjoying a full and complete opportunity to present their views in connection with the subpoenas. Their counsel agreed that the procedural argument was no longer viable since the court was considering the propriety of issuance of the subpoenas on a *de novo* basis.[7]

    2.    <u>Compliance with Rule 17, Fed. R. Cr. P.</u>

HRW's next argument is that the subpoena is improper under Rule 17(c) because it is being used to obtain discovery that is not allowed under Rule 16, Fed. R. Cr. P. (Doc. 8 at 10-11.) Rule 17(c)(1) provides that

> A subpoena may order the witness to produce any books, papers, documents, data or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.

HRW cites the provisions of Rule 16(a)(1)(G) which governs discovery of expert testimony in criminal cases and which requires that the Government, at defendant's

---

[7] HRW also mentions in a footnote in their initial brief that the subpoenas were served without witness or mileage fees that are required by Fed. R. Cr. P. 17(d). (Doc. 136 at 8 n. 4.) In this case, defendant is proceeding with appointed counsel, having established that he is unable to pay the costs of retaining counsel. (Doc. 44.) Fed. R. Cr. P. 17(b) states that where a defendant is unable to pay the witness fee, the process costs and witness fees will be paid in the same manner as those paid for witnesses the government subpoenas. Rule 17(d) then also provides that when the United States requests a subpoena, the server need not tender the attendance fee or mileage allowance. The court does not view HRW's statement about the witness fee to be a serious objection since it was made in a footnote and never mentioned at the motion hearing on May 11.

request, give the defendant a written summary of any expert testimony the Government intends to use. That summary "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." Because the Government has given defendant in this case such a summary, HRW argues that no further discovery is allowed under Rule 16, thus the subpoena for production of the underlying interviews upon which Longman's expert report and summary is based is improper.[8]

Rule 17(c)(2) specifically allows for motions to quash or modify subpoenas if compliance would be "unreasonable or oppressive." Therefore, HRW's arguments about improper use of a Rule 17(c) subpoena must fall within that description. The seminal case on that issue is United States v. Nixon, 418 U.S. 683

---

[8] It is interesting to note that the Government has not directly opposed the subpoena to HRW or to Longman insofar as those subpoenas seek the interview notes concerning the Nyakizu chapters of *Leave None to Tell the Story*. As noted above, and as confirmed at the May 11 hearing, the Government's objection went solely to the request for other materials used by Longman in formulating his expert opinion, and that issue has been resolved by agreement. While the Government cites cases for the proposition that Rule 17 is not to be used as a means of conducting general discovery or for production of materials whose evidentiary use is limited to impeachment (Doc. 138 at 2, 5), these arguments are not directed at the request for production of the interview notes. Since Rule 16 governs discovery by the parties to a criminal case, including the Government, and since it is the Government's expert witness that has relied on the interview notes, it would seem that the Government would want to be heard on the issue of production of the interview notes. See e.g., United States v. Wittig, 250 F.R.D. 548, 551 (D. Kan. 2008) (suggesting that the Government may have standing to be heard concerning issuance of a Rule 17(c) subpoena to third parties).

(1974).  Nixon approved a multi-part test for assessing the propriety of a subpoena

*duces tecum* under Rule 17(c):

> (a)  the documents must be evidentiary and relevant;
>
> (b)  they are not otherwise procurable reasonably in advance of trial by the exercise of due diligence;
>
> (c)  the requesting party cannot prepare for trial without such production and inspection in advance of trial and that failure to obtain such inspection may tend unreasonably to delay the trial; and
>
> (d)  the application is made in good faith and is not intended as a general "fishing expedition."

418 U.S. at 699-700.  *See also* United States v. Abdush-Shakur, 465 F.3d 458, 467

(10th Cir. 2006) (noting that on appeal, a movant seeking issuance of a Rule 17(c)

subpoena must show that the subpoenaed document was relevant, admissible and

specific).

        a.    *Relevance and admissibility.*

Consideration of this issue must proceed in light of the fact that Dr.

Longman is being presented as an paid expert witness for the Government.  As

such, and if he is properly qualified, he is entitled to give opinion testimony if (1)

the testimony is based upon sufficient facts or data, (2) the testimony is the product

of reliable principles and methods, and (3) the witness has applied the principles

and methods reliably to the facts of the case.  Fed. R. Evid. 702.  The facts or data

upon which an expert bases an opinion or inference need not be admissible in evidence in order for the opinion or inference to be admitted. Fed. R. Evid. 703. Finally, an expert may testify in terms of opinion or inference and give reasons therefore without first testifying to the underlying facts or data, unless the court requires otherwise. However, "[t]he expert may in any event be required to disclose the underlying facts or data on cross-examination." Fed. R. Evid. 705.

As to the issue of admissibility, HRW argues that the interview notes are not admissible because they are hearsay under Fed. R. Evid. 802, and lack authentication under Fed. R. Evid. 901. (Doc. 136 at 14.) HRW cites <u>United States v. Culbertson</u>, 651 F.2d 189, 192 (3rd Cir. 1981) for the proposition that inadmissible hearsay materials are not subject to a Rule 17(c) subpoena. That case, however, does not involve disclosure at trial of materials that are the bases for an expert's opinion and does not address the provision of Fed. R. Evid. 705 which provides that the court can require an expert witness to disclose the underlying facts and data on cross-examination. In fact, pursuant to Fed. R. Evid. 705, the court may, in its discretion, require the expert to testify about the underlying facts as part of his direct examination. *See* Advisory Committee Notes, 1993 amendment to Rule 705 (noting that the revisions were made to avoid a conflict with civil rules concerning discovery of expert witnesses and Fed. R. Cr. P. 16,

concerning disclosure in advance of trial of the basis and reasons for an expert's opinion.); 29 Wright and Gold, FEDERAL PRACTICE AND PROCEDURE, § 6294, p. 428 (1997). The same distinction is true of the case cited by HRW for the proposition that documents must be authenticated. United States v. Lepanto, 817 F.2d 1463, 1466 (10th Cir. 1987). HRW points to no cases which deal with the introduction into evidence of the underlying facts or data of a retained expert witness upon cross-examination.

In United States v. Lawson, 653 F.2d 299 (7th Cir. 1981), a psychiatrist was allowed to testify as an expert witness but admitted that he had not had much contact with the defendant and was basing his opinion largely on observations of other physicians and staff members concerning defendant's conduct during his stay at a federal medical center. Defendant objected to this testimony but it was allowed at trial. On appeal, defendant argued that allowing this testimony violated his right to confront adverse witnesses. The appeals court agreed that introduction of expert testimony based in large part on hearsay may raise serious constitutional problems if the defendant is not allowed adequate opportunity to cross-examine the witness. 653 F.2d at 301. The court discussed the provisions of Rule 703, but then noted:

> In criminal cases, a court's inquiry under Rule 703 must
> go beyond finding that hearsay relied on by an expert

meets these standards. An expert's testimony that was based entirely on hearsay reports, while it might satisfy Rule 703, would nevertheless violate a defendant's constitutional right to confront adverse witnesses. The Government could not, for example, simply produce a witness who did nothing but summarize out-of-court statements made by others. A criminal defendant is guaranteed the right to an effective cross-examination. "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974).

In addition to the reasonable reliance requirement of Rule 703, a criminal defendant must therefore also have access to the hearsay information relied upon by an expert witness. Without such access, effective cross-examination would be impossible. Rule 705, which provides that an expert need not disclose the facts or data underlying his opinion prior to his testimony unless the court orders otherwise, recognizes this requirement. The Advisory Committee notes to that rule state that it "assumes that the cross-examiner has the advance knowledge which is essential for effective cross-examination."

653 F.2d at 302 (footnotes omitted).  Because the defendant in <u>Lawson</u> had access to reports from the hospital and <u>Brady</u> materials from the Government, including reports from the FBI and U.S. Attorney's office, and because defendant himself had had some contact with the testifying doctor, the court concluded that the expert's testimony did not violate the defendant's right to confront adverse witnesses.

In <u>United States v. Affleck</u>, 776 F.2d 1451 (10th Cir. 1985), the government used an expert accountant who reviewed defendant's financial records to determine the issue of solvency. In addition, the expert interviewed other accountants who had worked for the company, other former employees, the Trustee in bankruptcy and others. During his testimony, the expert related what he had been told by those he had interviewed.[9] Defendant argued that because the government did not produce the actual declarants of these statements, he was denied the right to confront witnesses as guaranteed by the Sixth Amendment. The trial court relied on Rule 703 and denied this request. On appeal, the Tenth Circuit rejected the confrontation argument, noting: (1) that defendant had sufficient access to his own employees, accountants and the Trustee in bankruptcy who had been interviewed by the expert, and therefore he could have countered their statement; and (2) that during cross-examination, the impact of the expert's testimony could have been reduced by bringing out any problems involving reliance on these people's

_____

[9] During the expert's examination, the court repeatedly instructed the jury that the expert had referred to various things that others had told him out of court and not under oath and those matters were hearsay. The court stated that the only reason they were received and allowed in the expert's testimony is because they are the type of subjects that may be relied upon by an accounting expert in forming opinions like the ones stated by the witness. However, the court cautioned that these statements "are to be used by you, not for the truth of what was contained in them but in evaluating Mr. Norman's [the expert witness] testimony and the opinions that he gave in determining whether those opinions have validity or don't have validity." 776 F.2d at 1458.

statements or their veracity.  776 F.2d at 1458.  In reaching this conclusion, the court also specifically noted that the expert witness stated that the interviews were only held after the expert had reached his tentative conclusions based on examination of defendant's records, and that his testimony "was not simply a summarizing of the out-of-court statements of others. . . ."  776 F.2d at 1457.

Finally, the Tenth Circuit has concluded that because out-of-court statements relied upon by an expert to support his opinion are not offered for the truth of the statement, but to show how the expert arrived at his opinion, these statements are not truly considered hearsay and are admissible.  Richie v. Mullin, 417 F.3d 1117, 1126 n.1 (10th Cir. 2005) (Hartz, J., concurring), *citing* Wilson v. Merrell Dow Pharm., Inc., 893 F.2d 1149, 1153 (10th Cir. 1990).

The above cases support a conclusion that the interview notes sought by the subpoena in this case are admissible under the Nixon test even though they may be considered as hearsay.  They can be admitted as part of the cross-examination of Longman to evaluate Longman's expert opinions about what happened in Rwanda. Here, unlike Affleck, the expert witness is summarizing the substance of the witness interviews.  As previously noted, the witness interviews are cited in 112 footnotes in the Nyakizu chapters of *Leave None to Tell the Story*, and the chapter included detailed and specific quotes from those interviews.  Those chapters of the

book are the source of Longman's expert opinion, and the interviews are the raw data upon which Longman bases his expert opinion. Again, unlike <u>Affleck</u>, Longman is not using these interviews as confirmation of an opinion he reached through other sources. Finally, as will be discussed later, unlike <u>Affleck</u> and <u>Lawson</u>, defendant in this case has no other way to obtain access to the information upon which Longman bases his report.

Because the underlying interview notes are admissible to determine whether the expert's opinion has validity or not, some might characterize its use as being for impeachment. The Government argues that a Rule 17(c) subpoena cannot be used to obtain production of materials whose evidentiary use is limited to impeachment, citing <u>United States v. Cherry</u>, 876 F. Supp. 547, 553 (S.D.N.Y. 1995), and <u>Nixon</u>, 418 U.S. at 701. (Doc. 138 at 5 and n. 6.) <u>Nixon,</u> however, does not absolutely rule out <u>any</u> use of Rule 17(c) subpoenas to obtain impeachment evidence, and acknowledges that there may be some instances where such a subpoena can be used to obtain evidence that will be used for impeachment. The portion of the quote from <u>Nixon</u> that is cited by the Government must be considered in light of statements made immediately prior to the quoted portion:

> We also conclude there was a sufficient preliminary
> showing that each of the subpoenaed tapes contains
> evidence admissible with respect to the offenses charged
> in the indictment. The most cogent objection to the

admissibility of the taped conversations here at issue is that they are a collection of out-of-court statements by declarants who will not be subject to cross-examination and that the statements are therefore inadmissible hearsay. Here, however, most of the tapes apparently contain conversations to which one or more of the defendants named in the indictment were party. The hearsay rule does not automatically bar all out-of-court statements by a defendant in a criminal case. Declarations by one defendant may also be admissible against other defendants upon a sufficient showing, by independent evidence, of a conspiracy among one or more other defendants and the delarant [*sic*] and if the declarations at issue were in furtherance of that conspiracy. The same is true of declarations of coconspirators who are not defendants in the case on trial. *Dutton v. Evans*, 400 U.S. 74, 81, 91 S.Ct. 210, 215, 27 L.Ed.2d 213 (1970). Recorded conversations may also be admissible for the limited purpose of impeaching the credibility of any defendant who testifies or any other coconspirator who testifies. Generally, the need for evidence to impeach witnesses is insufficient to require its production in advance of trial. See, e.g., *United States v. Carter*, 15 F.R.D. 367, 371 (DC 1954). Here, however, there are other valid potential evidentiary uses for the same material, and the analysis and possible transcription of the tapes may take a significant period of time. Accordingly, we cannot conclude that the District Court erred in authorizing the issuance of the subpoena duces tecum.

418 U.S. at 700-702 (footnotes omitted).[10]   Thus, the Supreme Court recognizes

---

[10]  While the present case does not involve charges of conspiracy, it appears that one of the Government's arguments is that this defendant was a neighbor and close friend of a Francois Bazaramba, and may have been involved in alleged acts of genocide with him or under his control.  Bazaramba is mentioned throughout the Nyakizu chapters of *Leave None to Tell the Story*, and also in Longman's summary of his expert report given

that there are instances where out-of-court hearsay statements may be admissible and while "generally" impeachment evidence may not be sought by such a subpoena, the Court has not ruled out all use of subpoenas to obtain impeachment evidence.  *See* United States v. LaRouche Campaign, 841 F.2d 1176, 1180 (1st Cir. 1988) (allowing a Rule 17(c) subpoena for material that is intended for the sole purpose of impeachment of a witness at trial and noting that observation of the "general rule" announced in Nixon about impeachment evidence is left to the sound discretion of the district court).  Importantly, neither Nixon, nor any of the other cases cited by HRW concerning use of a subpoena to obtain impeachment evidence, involve a case like the present one where a paid expert witness is basing his opinion almost exclusively on witness interviews taken fifteen years ago as allowed by Fed. R. Evid. 703, and where defendant cannot effectively exercise his rights of cross-examination without access to those interviews.

After careful consideration, the court concludes that the subpoenas *duces tecum* in this case seek admissible evidence, even if that evidence is hearsay in nature and may not be admissible to establish the truth of the statements made in

_____

to the Government for use in this case in the section involving Nyakizu.  (Defendant's Ex. C at 12-14, 16.)  Bazaramba is being tried in Finland for acts of genocide, and it appears that defendant's name only appeared to surface in connection with that trial. Accordingly, to the extent that the interviews contain information about Bazaramba to support Longman's opinion, these are particularly critical to the issues in this case.

the interviews.  Furthermore, the court concludes that even if the interviews are used to question (or impeach) the validity and reliability of the expert's opinion, that does not bar use of a Rule 17(c) subpoena to obtain such underlying factual information.

As to the issue of relevance, and as previously noted, both HRW and the Government stress that Longman's testimony will be limited to a "general background discussion of the genocide events in Rwanda"  (Doc. 136 at 6, 13) and "to establish the background and framework necessary for the jury to understand the Rwandan genocide in general, and in Nyakizu Commune in particular."  (Doc. 138 at 4.)  Furthermore, both represent that Longman will testify, if asked on cross-examination, that after review of his notes and documents in his possession, he can find no reference to the defendant by name.[11]  (Doc. 136 at 13) ("That testimony will not identify Kobagaya as responsible for any of these events [genocide in Rwanda]."); (Doc. 138 at 3) ("Professor Longman has reviewed the materials in his physical custody and indicated that Kobagaya is not identified or otherwise mentioned in them.")  Because of this anticipated testimony, HRW argues that

---

[11]    In a February 22, 2008 email from Longman to the Government's counsel in this case, Longman states that in the interviews in Rwanda, the interviewer always asked people to list those people involved in attacks, particularly who they personally saw participating, and was "sorry" to report that "whoever this is you are dealing with does not appear to have been a key participant of any sort in Nyakizu."  (Defendant's Ex. B.)

nothing in the underlying notes could possibly be relevant to the charges against defendant in this case.

Even if defendant could be assured that this would be all of the testimony of Longman at trial, that alone does not make the request for the interview notes irrelevant. While Longman may not specifically name defendant as a participant in the genocide in Nyakizu, he paints a picture of a category of people who were involved in the genocide that could well include the defendant. This includes statements about Bazaramba, *see supra* note 8; about Bazaramba "and other elite individuals," *see* Defendant's Ex. C at 14; about Bazaramba being a close ally of Ntaganzwa, the mayor and head of the local chapter of the Democratic Republican Movement (MDR), *id.* at 12; about Burundian refugees being "strong supporters of Ntaganzwa, *id.*; and about the fact that many of leaders of the Baptist Church in Nyakizu came from Burundi.[12] *Id.* Statements like these, while not specifically

_____

[12] [THIS FOOTNOTE HAS BEEN REDACTED PER COURT ORDER]

naming defendant as a specific participant in genocide activities, clearly describes general categories of individuals connected to acts of genocide, and the Government at trial may well attempt to show that defendant fits into those categories of people.

At the May 11 hearing, the court used an analogy involving identification of a bank robber. A witness may not be able to specifically identify the robber by name or even identify the robber in a line-up, but that still does not make the witness's general testimony describing the robber irrelevant and inadmissible. That witness can still testify about characteristics of the robber, *e.g.,* whether the robber was tall or short, black or white, young or old, etc. That is the very type of "background" that Longman is providing in this case. His testimony about the genocide in Rwanda, and specifically in Nyakizu commune is relevant to the question of whether defendant participated in any acts of genocide. This is the basis upon which the Government is prosecuting defendant in this case claiming

_____

that he lied about any involvement in criminal acts on his application for citizenship. The fact that Longman does not specifically identify defendant by name in his testimony about genocide does not make the requested interviews irrelevant.

> b.   *Not otherwise procurable reasonably in advance of trial by the exercise of due diligence.*

Because defendant does not know the names of the witnesses interviewed by Longman which form the basis for his opinion, there is no way that defendant can obtain access to the information sought by the subpoena *duces tecum* prior to trial without having copies of the interview notes. Therefore, unlike <u>Affleck</u> and <u>Lawson</u>, defendant in this case has no other access to the information upon which Longman bases his report. While defendant's counsel has been to Africa to interview witnesses of whom he is aware, including individuals listed by the Government as witnesses in this case, defendant cannot be assured that he has interviewed the same witnesses that were interviewed by Longman or other HRW researchers. Furthermore, in this case, the interviews Longman relies upon are approximately fifteen years old, having been taken in 1994-1996 during the period immediately following the genocide in Rwanda when the memories of the persons interviewed would presumably be freshest. In light of this significant time delay, there is no assurance that these witnesses are still alive or can be located, or if they

are located, whether their memories will be as sharp as at the time of the earlier

interview. Therefore the information in the interviews cannot be obtained by

defendant in advance of trial by exercise of due diligence.

> c. *Defendant cannot prepare for trial without such production and inspection in advance of trial, and failure to obtain such inspection may tend unreasonably to delay the trial.*

Because the interviews were conducted fifteen years ago and those witnesses

may not be able to be located, this makes it even more important for defendant to

have access to the interview notes. In order to be able to exercise any effective

cross-examination of Longman, defendant must have access to the hearsay

information relied upon by the expert witness. United States v. Lawson, 653 F.2d

at 302. Also, because all of the persons interviewed by HRW are located in

Rwanda, even if they can be located now to ascertain the accuracy of Longman's

summary and/or to attempt to have them appear at trial, this cannot be delayed until

the time of trial. Defendant's counsel will not be able to adequately prepare for

trial and for cross-examination of Longman if the interview notes are not produced

in advance of trial.

It would also unreasonably disrupt the orderly progress of the trial if

production of the witness interviews is delayed until after Longman testifies and

defendant is ready to begin his cross-examination.[13]  It appears that there are

somewhere between 45 and 80 separate interview notes that relate to the Nyakizu

chapters in the book *Leave None to Tell the Story*, which interviews are also the

bases for Longman's expert testimony in this case.  *See e.g.*, Defendant's Ex. B

(45-50 interviews); Doc. 142 at 4 n. 2 (estimate of 80 interviews).  HRW's counsel

stated at the May 11 hearing that he had seen approximately 80 interviews but was

not sure if that was accurate.  As previously noted, there are 119 footnote citations

in the Nyakizu chapter of the book to specific interviews, but some of those are

duplicated.  Due to the number of interviews and their importance to Longman's

expert opinion, it would not be feasible or efficient to delay production of the

interview notes until defendant begins his cross-examination of Longman at trial.

> d.     *The application is made in good faith and is not intended as a*

---

[13]  Defendant's counsel has identified two individuals listed as trial witnesses by
the Government (witnesses G & O) who were previously interviewed by either Longman
or other HRW researchers. (Doc. 142 at 4 n. 2.)  However, defendant is uncertain whether
other individuals interviewed by HRW are listed as Government witnesses in this case or
not.  *Id.*  In the reply, HRW did indicate a willingness to "consider production of limited
material relating to persons who voluntarily appear as witnesses at trial."  (Doc. 152 at 9.)
After a Government witness testifies, the defendant may request production of any
statements of that witness, and the court must order an attorney for the Government to
produce any statement of the witness that is in their possession and that relates to the
subject matter of the witness's testimony.  *See* Fed. R. Cr. P. 26.2. However, the
Government stated at the May 11 hearing that it does not have possession of any of the
witness interviews conducted by HRW which are the bases of Longman's testimony,
therefore the provision of Rule 26.2 would be of no assistance to defendant in conducting
his cross examination of Longman at trial.

general *"fishing expedition."*

In support of its argument that the documents sought by defendant's subpoenas are simply part of a "fishing expedition," HRW states that the subpoenas do not designate the evidence sought "with specificity." (Doc. 136 at 14.) However, HRW acknowledged at the May 11 hearing that in discussions with defendant's counsel prior to the filing of the motion, it was clear to HRW what defendant was seeking in the way of witness interview notes. In fact, HRW had collected those materials, had redacted any information from them which would tend to show the identity of the witnesses, and was prepared to deliver the documents to defendant until they found out that defendant was going to Rwanda to interview witnesses. It was also stated that the requested materials could all fit in one banker's box.

In addition, because HRW has argued that the court conduct a *de novo* hearing to determine whether the subpoenas are proper or not, they must also accept the fact that the subpoenas, as issued, have been clarified by defendant during discussions with HRW's attorneys and in the filings with the court concerning the present motions. *See e.g.*, Doc. 142 at 2 ("To the extent that the government believes that the request is overbroad, the defense clarifies that the request does not extend to all documents possessed by Longman but simply those

obtained in conjunction with his research in Nyakizu while working with HRW on the *Leave None to Tell the Story* project.")   The court finds that defendant's identification of the documents he is seeking by the subpoenas is sufficiently specific to meet any requirements of <u>Nixon</u>.[14]

Therefore, while HRW argues that defendant's counsel is simply engaging in a "fishing expedition" in this case, the court cannot agree.  Counsel has stated the specific documents he is seeking by the subpoena and has given specific reasons for the production of the interview notes prior to trial that cannot be classified or summarily characterized as a "fishing expedition."

In conclusion, the court finds that the Rule 17(c)subpoenas in this case meet all of the requirements set out in <u>Nixon</u> and are not unreasonable or oppressive.

3.      The Newsgatherer's Privilege.

HRW next argues that even if the subpoenas comply with Rule 17(c), HRW should not be required to produce the requested documents because it is protected by the First Amendment and/or by a federal common-law newsgatherers' privilege. (Doc. 136 at 15.)  HRW's initial brief only discusses the First Amendment

_____

[14]  *See* <u>United States v. Wittig</u>, 250 F.R.D. 548, 552 (D. Kan. 2008) ("A request will usually be sufficiently specific where it limits documents to a reasonable period of time and states with reasonable precision the subjects to which the documents relate.")

privilege in detail[15] and relies on the Tenth Circuit case of Silkwood v. The Kerr-McGee Corp., 563 F.2d 433, 437 (10th Cir. 1977).

Defendant counters that before the ruling in Silkwood, the Supreme Court had refused to find that a news reporter had a privilege in connection with grand jury proceedings in the case of Branzburg v. Hayes, 408 U.S. 665 (1972). Defendant further argues that Silkwood's statements about any newsman's privilege is *dicta* and the case is distinguishable because Silkwood was a civil case, whereas Branzburg involved a criminal case. Defendant also argues that neither HRW nor Longman are newsmen within the meaning of any such privilege. (Doc. 142 at 11.)

In reply, HRW argues that HRW and Longman fall within courts' definition of a newsgatherer, noting that the individual claiming the privilege in Silkwood was a documentary filmmaker.[16]

     a.    *The First Amendment privilege.*

---

[15] HRW only mentions a privilege under federal common law and Fed. R. Evid. 501 in passing in the initial brief. In the reply, however, HRW cites specific cases concerning the recognition of a privilege under federal common law. (Doc. 152 at 11 n. 4.)

[16] HRW cites other cases where a book author and a nontraditional newsgatherer has been allowed to claim the federal common law privilege where they have intent to disseminate to the public at the time the gathering of information commences. (Doc. 152 at 12.) (citing von Bulow v. von Bulow, 811 F.2d 136, 142 (2nd Cir. 1987) and Shoen v. Shoen, 5 F.3d 1289, 1292-93 (9th Cir. 1993).

After Silkwood, district courts in the Tenth Circuit have continued to state that there is a qualified "journalist's privilege."  United States v. Foote, No. 00-CR-20091-KHV, 2002 WL 1822407 * 2 (D. Kan. Aug. 8, 2002) ("Following Branzburg, the Tenth Circuit also recognized a qualified federal common law 'journalist's privilege.'"); Re/Max Intern., Inc. v. Century 21 Real Estate Corp., 846 F.Supp. 910, 911-12 (D. Colo. 1994) (citing Silkwood as one of the opinions spawned by Branzburg which concluded that the existence of a qualified reporter's privilege is no longer in doubt.)  Also, the Tenth Circuit continued to apply Silkwood's balancing test, thereby continuing to recognize the existence of such a privilege.  Grandbouche v. Clancy, 825 F.2d 1463, 1466-67 (10th Cir. 1987).  The court has been unable to find any precedent in this circuit which fails to recognize Silkwood as announcing a First Amendment privilege for newsgatherers, and defendant has not cited any such authority.[17]  Moreover, courts in this district have

_____

[17] Legal commentators have seriously questioned whether Branzburg can legitimately be read as creating or recognizing a newsman's privilege, noting that to find such a privilege one must effectively turn Justice Powell's brief statement in his concurring opinion into the holding of the Court.  See 23 Wright and Graham, FEDERAL PRACTICE AND PROCEDURE, § 5426, pp. 740-47 (1980).  Approximately ten years after the Tenth Circuit's opinion in Silkwood, the Sixth Circuit refused to recognize a First Amendment privilege for reporters, noting that to recognize such a constitutional privilege would be to turn the dissenting opinion in Branzburg into a holding.  In re Grand Jury Proceedings, 810 F.2d 580, 583-86 (6th Cir. 1987).  See also In re Grand Jury Subpoena, Judith Miller, 438 F.3d 1141, 1145-49 (D.C. Cir. 2006).  While the reasoning in these cases is persuasive, we are bound by Tenth Circuit precedent on this issue.

applied the privilege to criminal cases as well as civil cases:

> Although *Silkwood* was decided in the context of civil
> litigation, the Court sees no legally-principled reason for
> drawing a distinction between civil and criminal cases
> when considering whether the reporter's interest in
> confidentiality should yield to the moving party's need
> for probative evidence.  Indeed, the important social
> interests in the free flow of information that are protected
> by the reporter's qualified privilege are particularly
> compelling in criminal cases.  Reporters are to be
> encouraged to investigate and expose, free from
> unnecessary government intrusion, evidence of criminal
> wrongdoing.

*See* United States v. Foote, 2002 WL 1822407 * 2.

Therefore, the court in this case will assume that there is a qualified

reporters' or newsgatherers' privilege and will proceed to apply the balancing test

set out by the Tenth Circuit in Silkwood:

> The trial court is empowered to compel the parties to
> catalog: in the case of appellee [Kerr-McGee], the
> evidence that it is seeking to the extent of its knowledge
> plus a showing of its efforts to obtain the information
> from other sources; in the case of appellant [Hirsh], a
> description which does not reveal information which is
> claimed to be privileged of the various documents and a
> description of the witnesses interviewed sufficient to
> permit the court to carry out a weighing process in
> accordance with the decisions above decided.

563 F.2d at 438.  One of the cases relied on by Silkwood was Garland v. Torre,

259 F.2d 545 (2nd Cir. 1958), *cert. denied*, 358 U.S. 910 (1958).  Silkwood adopted

four criteria discussed in <u>Garland</u> that should be considered in determining whether to disclose a news source in a libel action:

1. Whether the party seeking information has independently attempted to obtain the information elsewhere and has been unsuccessful.

2. Whether the information goes to the heart of the matter.

3. Whether the information is of certain relevance.

4. The type of controversy.

563 F.2d at 438. The court in this case has already addressed items 1 through 3 above, during its previous discussion of the requirements of Rule 17(c).

The court has found that defendant has attempted to obtain the information that is contained in the interview notes independently, but cannot do so for several reasons. First, defendant does not know the names of the persons interviewed by HRW (except for two individuals who have been identified by the Government as witnesses in this case). Second, due to the fact that the interviews were conducted right after the genocide in Rwanda in the time period 1994-1996, there is no assurance that the witnesses interviewed by HRW can still be located, even if their names are known to defendant. Third, there is the additional difficulty in this case that all the witnesses were in Rwanda and that alone makes defendant's task of attempting to get the information much more difficult.

The court has also found that the information sought goes to the heart of the matter in this case. The interviews all purport to give information about who participated in the genocide in Rwanda which is a critical element of the Government's case against defendant.

Finally, the court has also determined that the information sought is relevant, notwithstanding HRW's argument that none of the interviews names defendant specifically as a participant in the genocide.

This leaves consideration of the last criteria -- the type of controversy. This is a rather broad criteria that to some degree is a catch-all concerning any specifics about the case at issue. One of the first considerations is whether the case is civil or criminal. This is a criminal case which gives rise to many important constitutional safeguards for an accused defendant, including the right under the Sixth Amendment "to be confronted with the witnesses against him." As noted in United States v. Lawson, 653 F.2d 299 (7th Cir. 1981) and United States v. Affleck, 776 F.2d 1451 (10th Cir. 1985), it is important that defendant have access to the information relied upon by an expert witness in order to be able to conduct effective cross-examination. This is particularly important in this case where Longman's testimony is based almost exclusively on witness interviews -- witnesses that defendant may not have the ability to confront in person. This factor

weighs in favor of disclosure of the confidential sources and interview notes.

An even more critical factor in considering the type of controversy in this case is the fact that Longman is voluntarily appearing in this criminal case as a paid expert witness for the Government.[18]  In applying other privileges, courts in this district have noted that the burden is on the party asserting the privilege to prove all the elements of the privilege, including proof that the privilege has not been waived.  *See e.g.* Casson Constr. Co. v. Armco Steel Corp., 91 F.R.D. 376, 384 (D. Kan. 1980); In re Wyoming tight Sands Antitrust Cases, No. 85-2349-S, 1987 WL 93812 (D. Kan. Sep. 11, 1987).

The Tenth Circuit has also recognized that in applying the newsgatherers' privilege, one factor that should be considered in applying Silkwood's balancing test is whether or not the party claiming the privilege is deemed to have somehow waived the privilege by placing the requested information in issue.  In Grandbouche v. Clancy, 825 F.2d 1463 (10th Cir. 1987), plaintiff filed suit against the IRS and others claiming that the IRS had infiltrated the offices of the NCBA,

_____

[18]  At the May 11 hearing, the court inquired of HRW's counsel if any of the cases he relied on in connection with assertion of either a First Amendment or federal common law newsgatherer's privilege involved a voluntary paid expert witness who was opposing disclosure of underlying material relied upon by the expert witness to support his expert testimony.  Counsel could not point to any such case.  The court has independently reviewed all of these cases and could find no case involving a claim of privilege by a person appearing voluntarily at trial as an expert witness for one of the parties.

an organization that espouses dissident views on the federal income tax system, and that the IRS had seized documents from the NCBA and had harassed members of the organization in violation of their First and Fourth Amendment rights. During discovery, defendants requested the membership list of the NCBA and other information about its members. Plaintiff opposed the discovery request claiming that it would violate his First Amendment right of association. Defendants argued that plaintiff should be deemed to have waived his First Amendment privilege by filing suit and by placing into issue the information sought to be discovered. The Tenth Circuit refused to adopt a *per se* rule that a plaintiff waives his First Amendment privilege simply by bringing suit, but stated that "the fact that Grandbouche has placed certain information into issue by his complaint is a factor that the trial court should consider under the *Silkwood* balancing test." 825 F.2d at 1467.

Applying the reasoning of the above cases, the court believes that in order for HRW or Longman to claim the newsgatherers' privilege in this case, they must prove that the claimed privilege has not been waived. However, from the evidence in the record in this case, the court concludes that by voluntarily agreeing to act as a paid expert witness for the Government in this case, Longman has placed in issue the underlying information he relies on to support his expert opinion, and he has

therefore impliedly waived any privilege that might have otherwise been claimed. Likewise, to the extent that HRW claims that the underlying information belongs to HRW, but is made available to researchers like Longman, HRW has also impliedly waived any alleged privilege by failing to take steps to assure that its information is not voluntarily placed in issue by those using that information with HRW's consent.

The waiver of the privilege in this case is also supported by Longman's disclosure of the names of persons interviewed by HRW in other cases involving the genocide in Rwanda. Longman voluntarily met with government officials in Finland who are prosecuting other persons for the genocide in Rwanda, and in those sessions he voluntarily disclosed the names of persons that he or HRW had interviewed. *See* Defendant's Ex. A. This disclosure is in stark contrast to the position HRW and Longman are taking in this case, i.e., that disclosure of names or identities of persons interviewed by HRW cannot be disclosed because that will endanger those individuals. HRW and Longman cannot voluntarily disclose information concerning the persons who were interviewed to some people without waiving the claim of privilege when that same information is sought by defendant

in this case.[19]  *See* <u>Pinkard v. Johnson</u>, 118 F.R.D. 517, 523 (M.D. Ala., 1987)

(finding a waiver of the privilege, the court noted that "[a] reporter is not free to

give a sworn statement to a litigant, and later invoke the qualified reporter privilege

to keep this information from the Court.");  <u>Ayala v. Ayers</u>, 668 F. Supp.2d 1248,

1250 (S.D. Cal., 2009) (stating that, like other privileges, the journalist's privilege

may be waived, citing <u>Pinkard</u>).

    The above findings of waiver in this case also comply with the Supreme

Court's admonition in <u>U.S. v. Nixon</u> where the Court was considering the claim of

privileged Presidential communications:

> But this presumptive privilege must be considered in
> light of our historic commitment to the rule of law. This
> is nowhere more profoundly manifest than in our view
> that 'the twofold aim (of criminal justice) is that guilt
> shall not escape or innocence suffer.' *Berger v. United
> States,* 295 U.S., at 88, 55 S.Ct., at 633. We have elected
> to employ an adversary system of criminal justice in
> which the parties contest all issues before a court of law.
> The need to develop all relevant facts in the adversary
> system is both fundamental and comprehensive. The ends
> of criminal justice would be defeated if judgments were
> to be founded on a partial or speculative presentation of
> the facts. The very integrity of the judicial system and
> public confidence in the system depend on full disclosure
> of all the facts, within the framework of the rules of

---

[19]  Legal commentators note that waiver of the newsman's privilege seldom
receives adequate analysis.  23 Wright and Graham, FEDERAL PRACTICE AND
PROCEDURE, § 5426, pp. 798-801 ((1980).

evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense.

Only recently the Court restated the ancient proposition of law, albeit in the context of a grand jury inquiry rather than a trial,

'that 'the public . . . has a right to every man's evidence,' except for those persons protected by a constitutional, common-law, or statutory privilege, *United States v. Bryan*, 339 U.S. (323, 331, 70 S.Ct. 724, 730 (1949)); *Blackmer v. United States*, 284 U.S. 421, 438 (52 S.Ct. 252, 76 L.Ed. 375) (1932). . . .' *Branzburg v. Hayes*, United States, 408 U.S. 665, 688 (92 S.Ct. 2646, 33 L.Ed.2d 626) (1972).

418 U.S. 683, 708-709. Under the facts of this case, HRW and Longman have waived any right to assert a First Amendment claim as a newsgatherer.[20]

> b.     *Rule 501 and common-law privilege.*

While the court believes that its discussion of any First Amendment privilege resolves the issues concerning the subpoenas in this case, HRW also

---

[20] The court assumes for purposes of this case that HRW and Longman qualify as a newsgatherers as discussed in <u>Silkwood.</u> In <u>Silkwood</u>, Hirsch had been a free-lance reporter in the past, but at the relevant time was a film maker who did investigative reporting to use in preparation of a documentary film. The Tenth Circuit was not prepared to say that just because he was not a salaried newspaper reporter he was deprived of the right to claim the privilege. 563 F.2d at 436-37. Here, affidavits establish that HRW is a major publishing entity whose reports are accessible to the public without charge on its website. (Doc. 136-3 at 3.)

claims a common-law privilege under Fed. R. Evid. 501, citing cases that have

recognized such a privilege.  (Doc. 152 at 11 n. 4.)  Federal Rule of Evidence 501

states:

> Except as otherwise required by the Constitution of the
> United States or provided by Act of Congress or in rules
> prescribed by the Supreme Court pursuant to statutory
> authority, the privilege of a witness, person, government,
> State, or political subdivision thereof shall be governed
> by the principles of the common law as they may be
> interpreted by the courts of the United States in the light
> of reason and experience. However, in civil actions and
> proceedings, with respect to an element of a claim or
> defense as to which State law supplies the rule of
> decision, the privilege of a witness, person, government,
> State, or political subdivision thereof shall be determined
> in accordance with State law.

The Advisory Committee Notes to Rule 501 explains that "in criminal and Federal

question civil cases, federally evolved rules on privilege should apply since it is

Federal policy which is being enforced.[21]

HRW cites no Tenth Circuit case recognizing a common law privilege for

---

[21]  HRW also refers to state laws protecting reporters, commonly referred to as shield laws, noting that Kansas has just enacted such a law.  (Doc. 152 at 11 n. 5.)  Senate Substitute for House Bill 2585 does provide a privilege with regard to certain disclosures of information by a journalist. It appears, however, that Sec. 2 of that bill provides a privilege only for "refusing to disclose, in any state or local proceeding, any information or the source of any such information procured while acting as a journalist."  (Emphasis added).  The court does not consider this recent state legislation to be a compelling reason to recognize a common-law privilege in federal cases under Rule 501.

newsgatherers under Rule 501. Because the court must accept <u>Silkwood's</u> conclusion that a First Amendment privilege exists, the court concludes that the constitutional privilege would trump any attempt to create a common-law privilege under Rule 501, particularly where invocation of the privilege in a criminal case would necessarily implicate a defendant's Sixth Amendment right of confrontation. Even if the Tenth Circuit were to recognize such a common-law privilege, the court cannot believe that the parameters of that privilege would be more expansive than the contours of the First Amendment privilege, and therefore application of the common-law privilege would be based upon the same balancing test set out in <u>Silkwood.</u> Under the state of the law in this circuit, the court will therefore not recognize a common-law-newsgatherers' privilege under Rule 501; however, the court also concludes that if any such common-law privilege were recognized, the court's prior analysis concerning waiver of the First Amendment privilege in this case would apply equally to any such common-law privilege.

## CONCLUSION

The court is mindful of HRW's stellar reputation in the international community and its continuous activities to bring to light instances of genocide and similar crimes against humanity throughout the world so that the perpetrators of such crimes can be brought to justice. The court is also keenly aware of HRW's

stated concern about the safety of the persons interviewed by HRW in the course of the preparation of the book *Leave None to Tell the Story* if they are now contacted by counsel concerning possible testimony in this case. In fact, these same concerns for the safety of potential witnesses -- both prosecution and defense witnesses -- have been expressed in this case by both the Government and by the defendant. However, after considering these concerns, the court has previously ordered both the Government and defendant to exchange the names of their witnesses so that those witnesses might be interviewed by the opposing party if they are willing to be interviewed. (Doc. 108 at 1-2.) Those disclosures have been made and it appears that both parties have taken steps to attempt to interview witnesses listed by the other party. The Government did state at the May 11 hearing that one witness had received an allegedly threatening letter after being identified. However, defendant's counsel stated at the May 11 hearing that he had interviewed that same witness after the date of the alleged threat, and the witness had no problem being interviewed by counsel. Obviously Longman has not hesitated in the past to identify the people that HRW interviewed by name to the Finnish authorities. Longman and HRW must have recognized that the Finnish authorities might well seek to contact these individuals to verify their stories and/or to determine if they might be potential witnesses. In spite of the examples of past

witness abuses discussed in HRW's affidavits, the court cannot identify anyone whose name was disclosed to the Finnish authorities who has subsequently been threatened or abused.

The present case does not present the same facts normally encountered when a journalist seeks to protect sources of information. In most of those cases, one of the parties to a lawsuit seeks to compel the journalist to either testify or identify sources or both. The journalist is not a willing participant in the case but is being compelled to produce information involuntarily.[22] Here, that is not the case at all. Longman has interjected himself into this case voluntarily by agreeing to serve as a paid expert witness. No one compelled him to do so. The court appreciates HRW and Longman's desire to assist governmental authorities in the prosecution of individuals they believe, from their investigation, participated in genocide in Rwanda. However, they must realize that when they voluntarily enter the fray as a

_____

[22] HRW's reference to the newly-enacted Kansas shield law, *see supra* note 21, resulted from precisely this set of facts. The law was enacted after the Kansas Supreme Court issued a ruling denying a Petition for Mandamus in the case of *Gatehouse Media Holdings II, Inc. and Claire O'Brien, petitioners, against the Honorable Daniel L. Love, Judge of the 16th Judicial District, Ford County, Kansas and Terry J. Malone, Ford County Attorney, respondents*, Kansas Supreme Court Case No. 103,699, dated February 2, 2010. In that case, O'Brien, the reporter for the local newspaper, was subpoenaed by the Ford County Attorney to produce notes of her interview with the defendant in a pending criminal case in Ford County, Kansas. She refused to testify, and was jailed for contempt. The denial of her Petition for Mandamus strongly suggests that the Kansas Supreme Court was not inclined to recognize a common-law newsgatherers' privilege.

paid expert witness who relies on the substance of previous HRW interviews to support their expert opinions, neither HRW nor Longman can be allowed to create a roadblock to production of those underlying witness interviews.

For the above reasons, the Motion to Quash filed by HRW and Longman (Doc. 135) is DENIED, and the Government's Objection and Motion to Quash Defendant's Subpoena *Duces Tecum* Pursuant to Federal Rule of Criminal Procedure 17(c)  (Doc. 138) is found to be MOOT.

Longman and HRW are hereby directed to produce all documents possessed by Longman and HRW which were obtained in conjunction with research in Nyakizu while working on the *Leave None to Tell the Story* project.  Those documents are not to be redacted in any manner.  The documents are to be produced in the office of the undersigned U.S. Magistrate Judge, Room 403 U.S. Courthouse, 401 North Market, Wichita, Kansas not later than **4:00 o'clock p.m. on June 11, 2010.**[23]  The court will then allow the parties in this case and their counsel to inspect those documents as allowed by Fed. R. Cr. P. 17(c)(1).

_____

[23]  It appears from statements made by counsel at the May 11 hearing that HRW and Longman have already located and segregated the documents sought by the subpoenas and were ready to produce them to defendant in the past.  Therefore, the time frame for production of these documents pursuant to this Memorandum and Order should not be onerous or burdensome on either HRW or Longman.

## TEMPORARY SEALING OF THIS
## MEMORANDUM AND ORDER

As previously noted, the four exhibits proffered by defendant at the May 11, 2010 hearing had been produced pursuant to a protective order and therefore those exhibits are being filed under seal. Because the court has referred to and quoted from those exhibits, this Memorandum and Order will also initially be filed under seal. Counsel for the Government, counsel for defendant Lazare Kobagaya and counsel for Movants Human Rights Watch and Dr. Timothy Longman are being provided a copy of this sealed Memorandum and Order.

Within ten days of the date of this Memorandum and Order, any affected party may file a brief with this court pointing to discrete portions of the Memorandum and Order that the party believes should remain sealed and be redacted from any version of the Memorandum and Order before it is subsequently filed in the public record. Those briefs shall be limited to ten double-spaced pages per party and no responses shall be filed. The court will then determine which portions of the Memorandum and Order, if any, will be permitted to remain sealed.

## MOTIONS FOR REVIEW OF THIS
## MEMORANDUM AND ORDER

Pursuant to D. Kan. Rule 72.1.4(e), because this is a criminal case, any

motion for review by the assigned district judge of this Memorandum and Order shall be filed within ten (10) days of the filing of the Memorandum and Order.

**IT IS SO ORDERED.**

Dated this 20th day of May, 2010 at Wichita, Kansas.

s/ DONALD W. BOSTWICK

Donald W. Bostwick
United States Magistrate Judge
